Muhammad **ABDULLAH**, Appellant,

v.

David **ROACH**, et al., Appellees.

No. 94–SP–293.

District of Columbia Court of Appeals.

Argued Oct. 19, 1995.
Decided Dec. 4, 1995.

Hastings Jones, with whom Robert C. Hauhart, Staff Attorneys, Public Defender Service, Washington, DC, was on the brief, for appellant.

Mary L. Wilson, Assistant Corporation Counsel, with whom Erias Hyman, Acting Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief for appellees.

Before FERREN, SCHWELB, and REID, Associate Judges.

SCHWELB, Associate Judge:

The trial court denied Muhammad Abdullah's petition for a writ of habeas corpus without a hearing on the ground that Abdul-

lah failed to state a claim upon which relief could be granted. On appeal, Abdullah contends that his petition fairly alleged that correctional officials had deprived him of rights protected by the Due Process Clause of the Fifth Amendment and by local law. We hold that Abdullah has sufficiently alleged violations of the Lorton Regulations Approval Act of 1982 (LRAA), codified at 28 DCMR §§ 500 *et seq.* (1987). Accordingly, we reverse and remand for further proceedings.

## I.

### THE TRIAL COURT PROCEEDINGS

In 1981, Abdullah was convicted of murder while armed, armed robbery, and three counts of assault with a dangerous weapon. He was sentenced to aggregate terms of imprisonment of 23 years to life. He has been incarcerated since that time.

On October 13, 1993, Abdullah filed a petition for a writ of habeas corpus (the initial petition) alleging that in July of that year, he had been placed in "involuntary protective custody," which is a form of "administrative segregation," because authorities at Lorton claimed that an anonymous note threatening his safety had been delivered to a correctional officer. According to Abdullah's petition, a prisoner in administrative segregation is confined in a control cell for up to twenty-three hours per day, with only brief periods of release for showers and recreation.[1] Abdullah alleged that on August 12, 1993, Lorton's Housing Board convened a hearing with respect to his confinement. He asserted that no threatening note was produced at that hearing. Abdullah averred that the Housing Board found no factual basis for continuing administrative segregation, and that the Board recommended that Abdullah be returned to "Open Population." The Board's decision, according to Abdullah, was approved by David Roach, the Administrator of Lorton's Maximum Security Unit.

Notwithstanding the foregoing recommendation, Abdullah claimed in his petition that he was not released from administrative segregation. On August 27, 1993, in a letter to Administrator Roach, Abdullah's attorney requested that Abdullah be returned to Open Population "when the next vacancy occurs." On September 10, 1993, Roach responded that Abdullah had been "approved" for Cellblock Seven[2] but that "he will not be placed in front of other residents on the list who are also awaiting bed space in Cellblock Seven."

Dissatisfied with this response, Abdullah's attorney filed the initial petition for a writ of habeas corpus in the Superior Court. Administrator Roach and Walter B. Ridley, the Director of the Department of Corrections (DOC), were named as respondents. The petition alleged that the correctional authorities' failure to return Abdullah to Open Population violated his rights under the Constitution and under District of Columbia law. A Superior Court judge issued an order directing the respondents to show cause why a writ of habeas corpus should not be issued. *See* D.C.Code § 16–1901(a) (1989). The two correctional officials filed a response in which they contended that Abdullah's claim was moot because he was no longer in administrative segregation. The respondents also asserted that the petition failed to state a claim for relief under the Constitution, and they denied that they had failed to comply with the LRAA.

On December 8, 1993, Abdullah filed an amended petition. To his original allegations, he added a claim that, while his initial petition was pending, he had been falsely charged with threatening Joyce Pittman, the "unit manager" for the cellblock in which Abdullah was being held, and that he had been found guilty in a disciplinary proceeding in which several of his rights under the LRAA were allegedly violated. *See* 28 DCMR §§ 510.1–510.6 Abdullah asserted that his alleged threat to Ms. Pittman was

---

1. The LRAA provides that a resident in administrative segregation shall be provided at least two hours per week of out-of-cell recreation, but that even such limited recreation may be restricted because of extraordinary safety and security risks. 28 DCMR § 521.8.

2. Cellblock Seven is apparently in "Open Population."

said to have occurred on October 5, 1993, but that, in violation of the LRAA, no disciplinary report was filed until October 15, two days after the filing of his initial habeas corpus petition. As a result of the finding that he was guilty of the new charge, Abdullah was transferred to Maximum Security status and placed in punitive "adjustment segregation."

Abdullah claimed in his amended petition that these false charges were brought against him in retaliation for his exercise of his constitutional right to request judicial relief. He further alleged that correctional officials had violated the LRAA, *inter alia*, by intimidating witnesses who would have testified favorably to Abdullah and by interfering with the attempts by Abdullah's attorney to interview and present exculpatory witnesses.

A second Order to Show Cause was issued on January 5, 1994. On January 26, 1994, the respondents filed a new response in which they substantially reiterated their initial position. On February 5, 1994, the trial judge dismissed the amended petition on the ground that it failed to state a claim upon which relief could be granted. On February 15, 1994, Abdullah moved pursuant to Super.Ct.Civ.R. 59(e) to alter or amend the judgment. The trial judge denied that motion on the day that it was filed. This timely appeal followed.

## II.

## LEGAL DISCUSSION

*A. Scope of Appellate Review.*

■ The judge's ruling that the amended petition failed to state a claim upon which relief could be granted presents a question of law, and our review is therefore *de novo*. *Johnson–El v. District of Columbia*, 579 A.2d 163, 166 (D.C.1990). A pleading "should not be dismissed for failure to state a claim unless it is beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). The allegations in the petition must be taken

as true and construed in the light most favorable to the petitioner. *Id.*

■ Both parties supplemented their pleadings with exhibits, and Abdullah claims that the respondents' demand that the amended petition be dismissed should therefore have been treated as a motion for summary judgment. *See Foretich v. CBS, Inc.*, 619 A.2d 48, 55 (D.C.1993). The question whether summary judgment was properly granted is also one of law, and we review *de novo* a decision granting such relief. *See Osei–Kuffnor v. Argana*, 618 A.2d 712, 713 (D.C.1993). On summary judgment, we review the record independently and view it in the light most favorable to the non-moving party. *Colbert v. Georgetown Univ.*, 641 A.2d 469, 472 (D.C.1994) (en banc). A party seeking summary judgment must demonstrate that there is no genuine issue of material fact, and that he is entitled to judgment as a matter of law. *Id.;* Super.Ct.Civ.R. 56(c).

The trial judge's brief order of dismissal was framed in terms of what he perceived to be the legal insufficiency of the amended petition, standing alone. It is unclear whether the judge considered extrinsic materials in reaching his decision. The question whether we are dealing here with a dismissal for failure to state a claim or an order granting summary judgment, however, is of no consequence. For the reasons stated in this opinion, the order of dismissal cannot stand, regardless of whether it was issued pursuant to Rule 12(b)(6) or Rule 56 of the Superior Court's Civil Rules.

*B. Mootness and Justiciability.*

■ Respondents contended in the trial court that Abdullah's claim that he was entitled to release from administrative segregation was moot "because he is presently being held in adjustment segregation" and because his status "ha[s] been repeatedly reviewed administratively...." It does appear that the respondents' failure to release Abdullah from administrative segregation in August 1993 no longer presents a live controversy. It is undisputed that as a result of the subsequent disciplinary proceedings which Abdullah challenged in his amended petition, his

status was changed from involuntary protective custody in administrative segregation to the more punitive category of adjustment segregation. The issues raised by Abdullah, however, may fairly be characterized as "capable of repetition, yet evading review." *See, e.g., In re A.C.,* 573 A.2d 1235, 1242 (D.C. 1990) (en banc). Accordingly, the District now joins Abdullah in asking this court to decide the appeal on the merits, and we agree that it is prudent for the court to do so.[3]

## C. The LRAA.

### (1) The statute and regulations.

The District of Columbia Department of Corrections (DOC) has been authorized by statute to promulgate rules and regulations which govern the District's correctional facilities. D.C.Code § 24–442 (1989). The promulgation of these rules and regulations shall be "with the approval of the Council of the District of Columbia." *Id.*

Pursuant to the foregoing authority, DOC has issued regulations governing disciplinary proceedings and related matters at Lorton and other facilities. These regulations are now codified in 28 DCMR §§ 500–531 (1987). The Council approved these regulations by enacting the LRAA of 1982. 29 D.C.Reg. 3484 (1982).

We have previously held, and reiterate today, that DOC is bound by its own validly promulgated regulations, specifically including the LRAA. *Vaughn v. United States,* 598 A.2d 425, 433 (D.C.1991). "The LRAA has a binding effect on even the most senior correctional officials." *Price v. Kelly,* 847 F.Supp. 163, 167 n. 5 (D.D.C.1994), *aff'd,* 312 U.S.App.D.C. 461, 56 F.3d 1531 (1995). Accordingly, we must decide whether Abdullah's petition, viewed in the light most favorable to him, fairly alleges violations of the LRAA.

### (2) Administrative segregation.

The LRAA provides that before a resident may be placed in administrative segregation, there shall be a finding made that

(a) There is a clear and present threat to the safety of the resident; or

(b) The resident poses a clear and present threat to the safety of others; or

(c) The resident poses a definite escape risk.

28 DCMR § 521.4. "If a resident is placed in administrative segregation, that placement shall be reviewed at hearings held at thirty (30) day intervals." *Id.* § 527.1. It is further provided that

[i]f the Board determines that there is no longer an escape risk, or a security risk to the resident or others, the resident shall be released from segregation.

*Id.* § 527.8.

Abdullah has alleged that at a hearing on August 12, 1993, the Housing Board, "finding no factual basis for continuing [a]dministrative [s]egregation confinement, recommended that [he] be returned to Open Population." Abdullah has further alleged that this decision was approved by the Administrator of the Maximum Security facility. Nevertheless, according to the amended petition, Abdullah was still in administrative segregation sixty days later, apparently having been placed on a waiting list for release to Open Population.

If these allegations are taken as true for purposes of the motion to dismiss the amended petition, then Abdullah was retained in administrative segregation for a substantial period after Section 527.8 required his release from segregation. We express no opinion as to whether, at an appropriate hearing, respondents could present some justification for their failure to return Abdullah to Open Population on August 13, 1993 or immediately thereafter. That is an issue which can be determined at a hearing on the basis of an appropriate evidentiary record. The record

---

**3.** Some of the issues raised by Abdullah may not be moot even apart from the "capable of repetition yet evading review" exception. Abdullah prays, for example, that the finding that he was guilty of threats, which finding he alleges to be false and procedurally flawed, should be expunged or kept separate from his record, and that it should not be made available to the Parole Board. The finding that he challenges may thus have significant collateral consequences.

before the trial judge when he dismissed the amended petition on the pleadings was insufficient to enable him to evaluate any such hypothetical defense. The LRAA requires that, after there is no longer a threat to a prisoner in Abdullah's position, the prisoner shall be released. Abdullah effectively alleged in his amended petition that the Board had found that such a threat no longer existed, but that nevertheless he was not released within a reasonable time. Accordingly, Abdullah has fairly alleged a violation of the LRAA, and the record, viewed in the light most favorable to Abdullah, precludes the issuance of summary judgment in respondents' favor on this issue.[4]

### D. Adjustment Segregation.

■ In his amended petition, Abdullah has launched a "blunderbuss" attack on the procedures utilized to find him guilty of threats, and he has claimed that a plethora of LRAA provisions were violated. The gravamen of his complaint, however, is that he was falsely charged with threatening Ms. Pittman in reprisal for the exercise of his right to contest his retention in involuntary protective custody, and that Lorton officials placed pressure on potential exculpatory witnesses to inhibit them from testifying in his behalf. Abdullah also alleged that the disciplinary report against him was deliberately backdated in an attempt to create a factually false appearance of compliance with 28 DCMR § 506.4.[5]

The LRAA provides that, with exceptions not here applicable, [t]he resident shall be allowed to call at least two witnesses. 28 DCMR § 510.1. Counsel for the resident shall be given an opportunity to meet with potential witnesses "forty-eight hours before the adjustment hearing, provided that no potential adverse witness may be compelled to meet with counsel." Id. § 510.3. Although Abdullah's allegation that witnesses

were coerced may not be in direct contravention of these proscriptions—the fit between proscription and charge is less than precise—we are satisfied that, if the allegations are taken as true and liberally construed in Abdullah's favor, then Abdullah has sufficiently claimed that he was deprived of an effective opportunity to interview and present witnesses. Accordingly, we conclude that Abdullah's allegations regarding the disciplinary proceedings against him should not have been dismissed for failure to state a claim upon which relief may be granted.[6]

### E. Respondents' Defenses.

Respondents contend that even if the conduct alleged by Abdullah violated the LRAA, the amended petition was properly dismissed. They claim that the procedures prescribed in the LRAA are "precatory" rather than mandatory; that, even if those procedures are mandatory, the DOC's disposition of Abdullah's claims is not subject to judicial review; and that even if judicial review is available, the alleged violations are not sufficiently grave to entitle Abdullah to relief in a habeas corpus proceeding. We disagree with each of these contentions.

### (1) Enforceability of the LRAA.

■ Respondents' position, as presented at oral argument, appears to be that the strictures of the LRAA are not mandatory. Rather, they represent no more than aspirational notions as to what DOC should consider doing in an ideal world. Cf. Fountain v. Kelly, 630 A.2d 684, 686 n. 3 (D.C. 1993). But the provisions which respondents are alleged to have violated say "shall," a verb which ordinarily creates "a duty, not an option." Riggs Nat'l Bank v. District of Columbia, 581 A.2d 1229, 1257 (D.C.1990); cf. Adams v. Braxton, 656 A.2d 729, 731 (D.C.), cert. denied, —— U.S. ——, 116 S.Ct. 168, 133 L.Ed.2d 110 (1995). An agency is

---

4. In correspondence attached to the pleadings, respondent Roach referred to a "waiting list." The record discloses nothing, however, about the nature of that waiting list, the manner in which it was maintained or, indeed, the factual or legal basis, if any, for placing Abdullah on it.

5. Section 506.4 requires the accusing official, in the absence of exceptional circumstances, to file such a report within twenty-four hours.

6. Because the order dismissing the amended petition must be vacated on the grounds discussed above, we do not address Abdullah's various other claims.

bound to follow its own regulations. *Service v. Dulles,* 354 U.S. 363, 372, 77 S.Ct. 1152, 1157, 1 L.Ed.2d 1403 (1957); *Vaughn, supra,* 598 A.2d at 433. Our decision in *Vaughn* that DOC is "bound" by the LRAA cannot be reconciled with respondents' theory that the regulations which the Council approved are merely precatory.

### (2) Judicial review.

■ Respondents next contend that DOC's decisions regarding Abdullah are not subject to judicial review. They rely on a June 9, 1982 memorandum to the Council by David A. Clarke, then Chairman of the Committee on the Judiciary, which contains a section-by-section analysis of the proposed statute. According to Mr. Clarke,

> it is clear from both federal and state prisoner rights litigation that disciplinary proceedings at penal institutions do *not* require "trial-type" procedures such as are found in the federal Administrative Procedure Act or the state model APA.

(Emphasis in original). After citing legal authority for this proposition, Mr. Clarke wrote that "the procedures set forth in the subject regulations being hereby approved are not to be considered contested cases under the DCAPA." In a footnote to his memorandum, Mr. Clarke added:

> Besides there being no legal basis for providing "contested case" treatment for penal disciplinary hearings there is a practical barrier for providing appellate court review of these hearings, viz., there are

approximately 7,000 hearings per year at Lorton.[7]

■ Under the LRAA and our decision in *Singleton v. District of Columbia Dep't of Corrections,* 596 A.2d 56, 57 (D.C.1991). Abdullah is precluded from "contested case" review in this court of the disciplinary proceedings brought against him. *See* D.C.Code §§ 1–1509, –1510 (1992) (providing for direct review of contested cases by the District of Columbia Court of Appeals). Such preclusion, however, is essentially irrelevant here. Abdullah has not asked for "contested case" review in an appellate court. Rather, he has petitioned the trial court for a writ of habeas corpus. The Superior Court is expressly vested with statutory jurisdiction over a petition for a writ of habeas corpus directed to persons other than Federal officers and employees. D.C.Code § 11–921(a)(3)(A)(iii) (1995); *see also id.,* § 11–921(a)(6) (conferring jurisdiction on Superior Court over civil actions). Moreover, even apart from these statutory provisions, the actions of government agencies [8] were presumptively subject to judicial review at common law, 5 KENNETH C. DAVIS, ADMINISTRATIVE LAW TREATISE, § 28:1, at 254 (1984).[9] There is nothing in the LRAA, or in its legislative history as reflected in Chairman Clarke's memorandum, to suggest that the LRAA proscribes resort to the "Great Writ" [10] by a prisoner who claims that his liberty has been unlawfully restricted in violation of the LRAA.

In the present case, Abdullah complains that DOC arbitrarily restricted such personal liberty as he retained as a prisoner at Lor-

---

7. Mr. Clarke's memorandum actually related to a version of the LRAA which contained an express provision precluding "contested case" review. Bill No. 4–351, § 3 (Nov. 5, 1981). This section was omitted from the statute as enacted in the following year, 29 D.C.Reg. 3485, presumably because it was unnecessary in light of *Singleton.*

8. DOC is a government agency for present purposes. *See, e.g., Ramer v. Saxbe,* 173 U.S.App. D.C. 83, 85, 522 F.2d 695, 697 (1975) (Bureau of Prisons is an "agency" within the meaning of the federal APA); D.C.Code § 1–1502(3) (1992) ("the term 'agency' means both subordinate agency and independent agency"); *id.* § 1–1502(4) (executive department is a "subordinate agency"). Respondents do not dispute the proposition that DOC's disposition of Abdullah's case was agency action.

9. As the Supreme Court explained in *American School of Magnetic Healing v. McAnnulty,* 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90 (1902), courts

> *must* have power in a proper proceeding to grant relief. Otherwise, the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law and is in violation of the rights of the individual.

*Id.* at 110, 23 S.Ct. at 39 (emphasis added).

10. *See Stone v. Powell,* 428 U.S. 465, 474–75 n. 6, 96 S.Ct. 3037, 3043 n. 6, 49 L.Ed.2d 1067 (1976); *Ex parte Bollman,* 8 U.S. (4 Cranch) 75, 95, 2 L.Ed. 554 (1807) (Marshall, C.J.).

ton. He claims that, without any fault on his part, he was confined to a cell for twenty-three hours each day, with little opportunity for exercise or useful activity, and that these restrictions were placed upon him in violation of DOC's own regulations. The legislature has vested habeas corpus jurisdiction in the Superior Court, and there is no evidence at all—and certainly no clear and convincing evidence [11]—that the Council has denied prisoners, or intended to deny them, the right to contest the form of their detention by filing a petition for a writ of habeas corpus.[12]

### (3) Habeas corpus.

Respondents contend that even if the provisions of the LRAA are mandatory, and even if DOC's challenged actions are subject to judicial review, the judgment of the trial court should nevertheless be affirmed. They argue that a prisoner is entitled to habeas corpus relief only for the most serious violations of fundamental rights, and that Abdullah's allegations are insufficient to meet that standard. Although we agree with respondents that courts should exercise restraint in substituting their judgment for that of correctional officials with respect to the operation of DOC facilities, we do not believe that adherence to that salutary principle supports the dismissal of Abdullah's amended petition on the pleadings.

The District's habeas corpus statute provides in pertinent part as follows:

A person committed, detained, confined, or restrained from his lawful liberty within the District, under any color or pretense whatever, or a person in his behalf, may apply by petition to the appropriate court, or a judge thereof, for a writ of habeas corpus, to the end that the cause of the

commitment, detainer, confinement, or restraint may be inquired into.

D.C.Code § 16–1901(a) (1989).

The precedents in this jurisdiction foreclose a grudging or niggardly judicial approach to the vindication of the liberty interests that underlie the "Great Writ." "[H]abeas corpus has long been regarded as a proceeding in which a liberal judicial attitude is peculiarly appropriate in view of the broadly remedial nature of the writ." *Stewart v. Overholser,* 87 U.S.App.D.C. 402, 405, 186 F.2d 339, 342 (1950 (en banc) (quoting *Mercado v. United States,* 183 F.2d 486, 487 (1st Cir.1950)). As the Supreme Court explained in *Jones v. Cunningham,* 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963), the writ of habeas corpus

is not now and never has been a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose—the protection of individuals against erosion of their right to be free from wrongful restraints upon their liberty.

*Id.* at 243, 83 S.Ct. at 377; *see also Bennett v. Ridley,* 633 A.2d 824, 826 (D.C.1993) (quoting *Jones* ). By its terms, our habeas corpus statute reaches any restraint upon "lawful liberty," and Abdullah's allegation that he was so restrained in violation of the LRAA is thus sufficient, without regard to whether or not a constitutional interest is also implicated. *See, e.g., Adams, supra,* 656 A.2d at 731–33 (entertaining petition for writ of habeas corpus based on Parole Board's alleged failure to comply with its regulations); *Liberatore v. Story,* 854 F.2d 830, 838–39 (6th Cir.1988) (remanding habeas case to trial court to determine whether Parole Commission violated its regulations); *Lozada v. Warden,* 223 Conn. 834, 613 A.2d 818, 823 (1992) (habeas corpus relief extends to nonconstitutional claims). The writ of habeas corpus is, in Blackstone's words, a remedy for "all man-

---

**11.** [O]nly upon a showing of "clear and convincing evidence" of a contrary legislative intent should the courts restrict access to judicial review.
*Abbott Labs. v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967) (citations omitted).

**12.** Respondents point to Chairman Clarke's observation in his memorandum that there were

approximately 7,000 disciplinary hearings a year at Lorton. The remedy which Mr. Clarke suggested, however, was to reaffirm that "contested case" review in this court was not available. Neither he nor the Council proposed that prisoners should be deprived of the right to seek judicial review of their confinement through the traditional means of filing a petition for a writ of habeas corpus in the Superior Court.

ner of illegal confinement." 3 WILLIAM BLACKSTONE, COMMENTARIES 131 (Lewis ed. 1902), *quoted in Harris v. Nelson,* 394 U.S. 286, 291, 89 S.Ct. 1082, 1086, 22 L.Ed.2d 281 (1969).

Respondents expressly acknowledge, as they must, that habeas corpus tests not only the fact but also the form of detention. *See, e.g., Hudson v. Hardy,* 137 U.S.App.D.C. 366, 367 n. 3, 424 F.2d 854, 855 n. 3 (1970) (per curiam) (citations omitted). In *Hudson,* a prisoner alleged that he had been unlawfully placed in a control cell, and that he was denied the right, *inter alia,* to attend religious services. Observing that "[t]he core of his complaint ... was an unlawful deprivation of liberty," the court held that his petition was cognizable in habeas corpus. *Id.* at 367, 424 F.2d at 855.

In *Austin v. United States,* 299 A.2d 545 (D.C.1973), a prisoner who had been sentenced pursuant to the former Federal Youth Corrections Act, 18 U.S.C. 5010 *et seq.* (repealed), had spent many months in the Women's Detention Center, which was not a certified youth facility under the Act. This court, while recognizing that "some delays in the transfer of an offender to a certified facility are inevitable," stated that such delays should not be permitted to become protracted. *Id.* at 548. The court added that if

an offender's detention in an adult facility becomes unduly long, the appropriate means of seeking relief is the submission to the trial court of a petition for a writ of habeas corpus pursuant to D.C.Code 1967, § 16–901 (Supp. V, 1972).

*Id.*

The present case is comparable to *Hudson* and *Austin.* Abdullah, like Ms. Austin, asserts that he was confined in inappropriate conditions—in his case, administrative segregation—for a substantial period after he should have been transferred to a more appropriate facility. Like the petitioner in *Hudson,* Abdullah also complains that his placement in adjustment segregation was unlawful, and that he has been deprived of rights and privileges to which he claims to have been entitled, and which he would have been permitted to enjoy but for the allegedly tainted disciplinary proceeding against him.

"When a factual issue is at the core of a detention challenged by an application for the writ, it ordinarily must be resolved by the hearing process." *Stewart, supra,* 87 U.S.App.D.C. at 405, 186 F.2d at 342. Without determining the facts—*e.g.,* why Abdullah was retained in administrative segregation after August 1993—the trial court cannot meaningfully assess the legality of his detention. *Cf. Miller v. Overholser,* 92 U.S.App.D.C. 110, 115, 206 F.2d 415, 420 (1953).

Relying on a line of constitutional Due Process cases culminating in the Supreme Court's recent decision in *Sandin v. Conner,* —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), respondents assert that administrative or disciplinary segregation is not a sufficiently harsh measure to implicate a liberty interest redeemable by habeas corpus. Even if we were dealing in this opinion with the Due Process Clause, rather than with the LRAA, respondents may be reading *Sandin* too broadly.[13] In any event, our decision in this case is based exclusively on the LRAA. See note 14, *infra.* The Court explicitly noted in *Sandin* that prisoners in Conner's situation may, *inter alia,* "draw upon internal prison grievance procedures and state judicial review where available." *Id.* at —— n. 11, 115 S.Ct. at 2302 n. 11. It is solely to Abdullah's invocation of legislatively approved prison grievance procedures, and to the judicial review available under District of

---

13. The decision in *Sandin* appears to rest, in part, on the Court's view that

Conner's confinement did not exceed similar, but totally discretionary confinement in either duration or degree of restriction. Indeed, the conditions at Halawa [prison in Hawaii] involve significant amounts of "lockdown time" even for inmates in the general population. Based on a comparison between inmates inside and outside disciplinary segregation, the

State's actions in placing him there for 30 days did not work a major disruption in his environment.

—— U.S. at ——, 115 S.Ct. at 2301. We cannot determine from the pleadings whether the conditions in which prisoners are held in segregation at Lorton are sufficiently similar to the conditions of prisoners in Open Population to render applicable the Court's reasoning in *Sandin.*

Columbia law, that our decision in this case is addressed.[14]

## III.

## CONCLUSION

For the foregoing reasons, the order dismissing Abdullah's amended petition is reversed. The case is remanded to the Superior Court for proceedings consistent with this opinion.

*So ordered.*

---

**14.** Because the LRAA requires reversal of the trial court's decision, we do not reach either Abdullah's constitutional contentions or his argument that DOC's "Classification Operations Manual" creates a liberty interest enforceable under District of Columbia law. As to the latter contention, however, *see Sandin supra,* —— U.S. at ——, 115 S.Ct. at 2299; *Miller v. Henman,* 804 F.2d 421, 425–28 (7th Cir.1986), *cert. denied,* 484 U.S. 844, 108 S.Ct. 136, 98 L.Ed.2d 93 (1987).