**DISTRICT OF COLUMBIA, et al., Appellants,**

v.

**The SIERRA CLUB, Appellee.**

Nos. 95–CV–509, 95–CV–676 & 95–CV–677.

District of Columbia Court of Appeals.

Argued Sept. 20, 1995.
Decided Jan. 19, 1996.

---

**11.** We express no opinion at all on whether those admissions in fact were evidence of unlawful discrimination.

Donna M. Murasky, Assistant Corporation Counsel, with whom Garland Pinkston, Jr., Acting Corporation Counsel at the time the brief was filed,* and Charles L. Reischel, Deputy Corporation Counsel, Washington, DC, were on the brief, for appellants.

James R. Wrathall, Washington, DC, for appellee.

Before SCHWELB and KING, Associate Judges, and GALLAGHER, Senior Judge.

SCHWELB, Associate Judge:

This is an appeal by the District of Columbia and several of its officials (collectively "the District") from three orders of the Superior Court preliminarily enjoining the Dis-

trict from discontinuing or suspending the curbside recycling collection program which, according to plaintiff Sierra Club, is mandated by the District of Columbia Recycling Law (DCRL), D.C.Code §§ 6–3401 *et seq.* (1995) (as amended).[1] The District contends that the DCRL does not create a private right of action or authorize the Sierra Club's suit, and that the Mayor's discretionary action in suspending the curbside collection program is not subject to judicial review. The District also argues that the 1995 amendments to the DCRL confer upon the Mayor the authority to determine whether funds are available to enable the District to continue curbside collection, and that the preliminary injunction was improvidently issued. We reject the District's first contention but agree with the second. Accordingly, we vacate the preliminary injunction and remand the case for further proceedings consistent with this opinion.

## I.

### STATUTORY BACKGROUND

The DCRL was enacted in 1988. The legislation was based on a finding by the Council of the District of Columbia that

[m]ethods of solid waste management that emphasize source reduction and recycling are essential to the long-range preservation of the health, safety, and well-being of the public, the economic productivity and environmental quality of the District, and the conservation of resources.

D.C.Code § 6–3401(5). The statute provides, in pertinent part, as follows:

By April 1, 1990, occupants of residential property shall separate from their solid waste and containerize all metals and glass in 1 container as required by the Mayor by rules issued pursuant to § 6–3418. The Mayor shall provide collection services and establish a collection schedule to imple-

---

*\* Charles F.C. Ruff* was Corporation Counsel at the time the reply brief was filed, and was on the reply brief for appellants.

**1.** The formal name of the DCRL is the District of Columbia Solid Waste Management and Multi–Material Recycling Act of 1988.

ment this subsection pursuant to subsection (e) of this section.

§ 6–3407(d).

On April 28, 1995, the Mayor signed the Omnibus Budget Support Emergency Act of 1995 (OBSEA), D.C.Act 11–44, 42 D.C.Reg. 2217. The OBSEA conditions the operation of the recycling program on the availability of revenues, and provides that the program may be financed either from funds generated by a recycling "surcharge" imposed on solid waste haulers or from the Council's appropriations for solid waste management. § 504, 42 D.C.Reg. at 2217, 2229–30.

## II.

### THE SIERRA CLUB'S SUIT

In 1990, the Sierra Club instituted this action in the Superior Court. The Sierra Club alleged that the District had failed in several respects to comply with the DCRL, and prayed for injunctive relief. The District filed a motion to dismiss the complaint or, in the alternative, for summary judgment, contending that the Sierra Club lacked standing to sue[2] and that the injunction sought by the Sierra Club would intrude upon a core executive function in violation of the principle of separation of powers. On September 30, 1992, Judge Stephen S. Eilperin denied the District's motion. On November 10, 1992, the judge, concluding, *inter alia,* that the DCRL contemplated curbside collection, issued a preliminary injunction. That injunction provided, in pertinent part, that "[t]he District shall provide curbside collection of newspapers, metals, glass and yard waste ... to all occupants of residential property in the District of Columbia by January 1, 1993, and shall provide for the recycling of such materials." The District did not appeal from the preliminary injunction.

In early April 1995, the Department of Public Works (DPW) announced that, in light of the District's financial crisis, it would be necessary to suspend temporarily the curbside recycling program. On April 28, 1995, the contracts of thirty-six DPW employees

assigned to the recycling program were allowed to expire. In lieu of that program, the DPW identified for District residents certain centralized collection points at which they could deposit their recyclables.

On April 26, 1995, the Sierra Club filed a motion for a temporary restraining order (TRO) prohibiting the suspension of the curbside recycling program. Two days later, Judge Bruce Beaudin issued a TRO requiring the District to continue operation of that program. Subsequently, in a series of orders entered in May 1995, Judge Susan R. Winfield granted the Sierra Club's application for a preliminary injunction and ordered that the program be maintained in effect. These appeals followed.

## III.

### THE SIERRA CLUB'S RIGHT TO JUDICIAL REVIEW

Relying on the Supreme Court's decision in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), and *Cort's* progeny, the District contends that "[t]he Sierra Club may not maintain this action because there is no private right of action for alleged violations of the Recycling Act." We do not agree.

Distilled to its essence, the Sierra Club's complaint seeks equitable relief from adverse and allegedly unlawful action by a public officer. Specifically, according to the Sierra Club, the DCRL requires the District to provide curbside collection of recyclables, and the suspension of curbside collection contravenes this statutory mandate. It is the District's position that, even if the DPW violated the DCRL in this regard, the Superior Court lacks authority to do anything about it. This contention cannot be reconciled with the applicable precedents or with the sound reasons of policy that underlie them.

*A. Presumption of Reviewability.*

◼ As the Supreme Court explained, almost a century ago, in *American Sch. of*

---

**2.** In the present appeal, the District has not challenged the Sierra Club's standing to bring this suit.

*Magnetic Healing v. McAnnulty*, 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90 (1902), courts

> *must* have power in a proper proceeding to grant relief. Otherwise, the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law and is in violation of the rights of the individual.

*Id.* at 110, 23 S.Ct. at 39 (emphasis added); *see also Abdullah v. Roach*, 668 A.2d 801, 807 n. 9 (D.C.1995) (quoting *McAnnulty*). Accordingly, "[t]he actions of government agencies are normally presumed to be subject to judicial review unless [the legislature] has precluded review or a court would have no law to apply to test the legality of the agency's actions." *Simpson v. District of Columbia Office of Human Rights*, 597 A.2d 392, 398 (D.C.1991) (quoting *Carlin v. McKean*, 262 U.S.App.D.C. 212, 214, 823 F.2d 620, 622 (1987), *cert. denied*, 484 U.S. 1046, 108 S.Ct. 784, 98 L.Ed.2d 870 (1988)). As Judge Ferren has written,

> [t]he strong presumption favoring judicial review of agency action reflects a recognition that review is essential to promoting agency responsiveness to legislative mandates.... [U]nreviewability gives the executive a standing invitation to disregard ... statutory requirements....

*People's Counsel v. Public Serv. Comm'n of the District of Columbia*, 474 A.2d 1274, 1278 n. 2 (D.C.1984) (concurring opinion) (citations and internal quotation marks omitted).[3]

■ "[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Abbott Labs. v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967) (citations omitted). The authority of courts to grant relief from unlawful agency action existed at common law, and it was merely reinforced (and not created) by the federal Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.* (1994),

and similar local enactments. *See Abbott Labs., supra*, 387 U.S. at 140, 87 S.Ct. at 1511. "The presumption of reviewability is not the product of enacted law, it is common law." 5 KENNETH C. DAVIS, ADMINISTRATIVE LAW TREATISE § 28.1, at 254 (2d ed. 1984); *see also Abdullah, supra*, 668 A.2d at 807–08 (citing DAVIS).

There are two principal exceptions to the presumption of judicial reviewability. First, the legislature may commit the challenged action entirely to agency discretion. Second, it may preclude review, explicitly or implicitly, by statute. *See, e.g., Heckler v. Chaney*, 470 U.S. 821, 828, 105 S.Ct. 1649, 1654, 84 L.Ed.2d 714 (1985). Neither of these exceptions applies here.

■ A legislative intention to commit an action entirely to agency discretion—a "very narrow exception" to the governing presumption—may properly be inferred only in "those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820–21, 28 L.Ed.2d 136 (1971) (citations and internal quotation marks omitted).[4] In this case, the statute requires the Mayor to provide collection services, *see* D.C.Code § 6–3407(d), and the Mayor's acts or omissions can readily be evaluated by reference to that obligation. Furthermore, nothing in the DCRL explicitly or implicitly precludes judicial review. *See, e.g., Briscoe v. Bell*, 432 U.S. 404, 413, 97 S.Ct. 2428, 2433–34, 53 L.Ed.2d 439 (1977) (requiring a "clear showing of preclusion"); *Simpson, supra*, 597 A.2d at 398. The presumption thus stands unrebutted.

■ We have held that the Superior Court may entertain claims for equitable relief from allegedly unlawful action by public officials pursuant to D.C.Code § 11–921(a)(6) (1995), which vests that court with jurisdiction over "any civil action or other matter, at law or in equity, brought in the District of Columbia."

---

3. We are satisfied that the decision to suspend curbside collection was "agency action" for present purposes. *See Abdullah, supra*, 668 A.2d at 807 n. 8.

4. The Supreme Court has recognized, for example, that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Heckler, supra*, 470 U.S. at 831, 105 S.Ct. at 1655.

*See, e.g., Speyer v. Barry,* 588 A.2d 1147, 1159–60 (D.C.1991), and authorities there cited; *Abdullah, supra,* 668 A.2d at 807. The availability of review by this court of agency decisions in "contested cases"—those in which trial-type proceedings are required at the agency level—does not preclude judicial review in other matters, because "[a]ny party aggrieved by an agency's decision may initiate an appropriate equitable action in the Superior Court to seek redress." *Capitol Hill Restoration Soc'y v. Moore,* 410 A.2d 184, 188 (D.C.1979).

## B. "Implied Right of Action" Analysis.

■ We do not agree with the District's contention that *Cort v. Ash, supra,* provides the proper analytical framework for determining whether the Sierra Club may maintain this action. Judicial reviewability of agency action does not depend on the creation of a private right of action in the statute sought to be enforced. *Japan Whaling Ass'n v. American Cetacean Soc'y,* 478 U.S. 221, 230–31 n. 4, 106 S.Ct. 2860, 2866–67 n. 4, 92 L.Ed.2d 166 (1986). On the contrary, as Judge (now Justice) Breyer explained for the court in *N.A.A.C.P. v. Secretary of Hous. & Urban Dev.,* 817 F.2d 149 (1st Cir.1987),

> it is difficult to understand why a court would ever hold that Congress, in enacting a statute that creates federal obligations, has implicitly created a private right of action against the *federal* government, for there is hardly ever any need for Congress to do so. That is because federal action is nearly always reviewable for conformity with statutory obligations without any such "private right of action."

*Id.* at 152 (emphasis in original) (citing, *inter alia, Abbott Labs., supra,* 387 U.S. at 140, 87 S.Ct. at 1511; *McAnnulty, supra,* 187 U.S. at 110, 23 S.Ct. at 39, and 5 DAVIS, *supra,* § 28.1, at 254–56). Given the availability of judicial review of agency action pursuant to

*McAnnulty* and its progeny and to the federal APA, the court in *N.A.A.C.P.* thought it

> not surprising that cases discussing a "private right of action" implied from a federal statute do not involve a right of action against the federal government. Rather, they typically involve statutes that impose obligations upon a *nonfederal person* (a private entity or a nonfederal agency of government). The statute typically provides that the federal government will enforce the obligations against the nonfederal person. The "private right of action" issue is whether Congress meant to give an injured person a right himself to enforce the federal statute directly against the nonfederal person or whether the injured person can do no more than ask the federal government to enforce the statute.

*N.A.A.C.P., supra,* 817 F.2d at 152 (emphasis in original).[5]

Judge Breyer's reasoning in *N.A.A.C.P.* that no "private right of action" is necessary to obtain judicial review of agency action is directly applicable here. The Sierra Club alleged in its complaint that District officials violated specific statutory mandates by terminating the recycling program. It invoked the general equitable jurisdiction of the Superior Court, and sought equitable relief requiring the District to comply with the law. In this regard, this case is indistinguishable from *N.A.A.C.P.*[6]

The District contends that *Kelly v. Parents United,* 641 A.2d 159 (D.C.), *modified on other grounds,* 648 A.2d 675 (D.C.1994), in which this court applied *Cort v. Ash* analysis to a suit alleging adverse and unlawful agency action, precludes this court from rejecting that analysis here. In *Kelly,* however, both parties assumed in their submissions that *Cort v. Ash* provided the correct legal framework. No party invoked, and the court did not consider, either the presumption of re-

---

5. Although the court in *N.A.A.C.P.* referred to federal statutes and the federal government, its reasoning is equally applicable to the present case. The precedents in this jurisdiction recognize the same presumption that judicial review of agency action is available as do the authorities on which Judge Breyer relied. See Part III. A, *supra.*

6. We are not at all persuaded by the District's contention that the *N.A.A.C.P.* decision is contrary to *Cannon v. University of Chicago,* 441 U.S. 677, 699–701, 99 S.Ct. 1946, 1958–60, 60 L.Ed.2d 560 (1979). See discussion in *N.A.A.C.P., supra,* 817 F.2d at 153, explicating the court's rationale.

viewability of agency action or the Superior Court's authority to entertain suits for equitable relief where a party has alleged that such agency action was unlawful.

As we recently had occasion to reiterate in *Murphy v. McCloud*, 650 A.2d 202 (D.C.1994), "[t]he rule of stare decisis is never properly invoked unless in the decision put forward as precedent the judicial mind has been applied to and passed upon the precise question." *Id.* at 205 (quoting *Fletcher v. Scott*, 277 N.W. 270, 272 (Minn. 1938) (citations omitted)). "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Id.* (quoting *Webster v. Fall*, 266 U.S. 507, 511, 45 S.Ct. 148, 149, 69 L.Ed. 411 (1925)); *see also Thompson v. United States*, 546 A.2d 414, 423 n. 14 (D.C.1988) (quoting *Webster*). "A point of law merely assumed in an opinion, not discussed, is not authoritative." *Murphy, supra,* 650 A.2d at 205 (quoting *In re Stegall*, 865 F.2d 140, 142 (7th Cir.1989)). This is especially true with respect to jurisdictional issues, for "when questions of jurisdiction have been passed on in prior decisions *sub silentio,* this court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us." *Id.* (quoting *Hagans v. Lavine*, 415 U.S. 528, 533–35 n. 5, 94 S.Ct. 1372, 1377 n. 5, 39 L.Ed.2d 577 (1974)).

At most, the question whether the mode of analysis set forth in *Cort v. Ash* applies to suits alleging unlawful governmental conduct "lurk[ed] in the record" in *Parents United.* The parties and the court assumed that *Cort* applied. Nobody challenged that assumption, and the "judicial mind" did not apply itself to the issue or pass upon it. Under these circumstances, *Parents United* is not controlling.

*C. The Deportation Cases.*

The District also relies on *Gonzalez v. United States I.N.S.*, 867 F.2d 1108 (8th Cir.

1989), as support for the proposition that *Cort v. Ash* applies. In *Gonzalez,* an incarcerated alien, who was serving a sentence for possession of heroin with intent to distribute it, filed a petition for a writ of mandamus to compel the Attorney General to bring a prompt deportation proceeding against him while he was in the custody of prison authorities. *Id.* at 1108–09. The alien sought, in effect, to be deported during his term of incarceration, rather than after its completion. The court, invoking *Cort v. Ash,* held that a statute then providing that deportation proceedings shall be brought as expeditiously as possible did not create an implied right of action in favor of imprisoned aliens. *Id.* at 1109–10.

*Gonzalez* and the decisions which have adopted its reasoning,[7] however, differ materially from the present case. The determination whether and when to institute enforcement proceedings against a specific individual is a core executive responsibility which may reasonably be viewed as having been committed to agency discretion so as to preclude substantive judicial review. See note 3, *supra.* The Sierra Club, on the other hand, is not asking the court to compel the District to institute enforcement proceedings against anyone. Rather, it seeks injunctive relief requiring DPW to collect recyclables as contemplated in the DCRL.

In any event, in *Gonzalez* and its progeny, as in *Parents United,* the courts did not address the question, which at most "lurk[ed] in the record," whether *Cort v. Ash* analysis applied at all. In *Soler v. Scott,* 942 F.2d 597 (9th Cir.1991), *vacated as moot sub nom. Sivley v. Soler,* 506 U.S. 969, 113 S.Ct. 454, 121 L.Ed.2d 364 (1992), the court did directly deal with that issue and held, on facts similar to those in *Gonzalez,* that the *Cort* model did not apply:

> The district court's conclusion that Soler's claim depends upon the existence of an

---

7. *Gonzalez* was followed in *Prieto v. Gluch*, 913 F.2d 1159, 1165–66 (6th Cir.1990), *cert. denied,* 498 U.S. 1092, 111 S.Ct. 976, 112 L.Ed.2d 1061 (1991); *Aguirre v. Meese*, 930 F.2d 1292, 1293 (1991); (7th Cir.1991) (per curiam); and *Orozco v. United States I.N.S.*, 911 F.2d 539, 541 (11th Cir. 1990) (per curiam).

implied private right of action under Section 701 was mistaken.

When a petitioner seeks to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), it is not necessary to determine whether the underlying statute creates a private right of action. "The 'right of action' in such cases is expressly created by the Administrative Procedure Act.... A separate indication of congressional intent to make agency action reviewable under the APA is not necessary; instead, the rule is that the cause of action for review of such action is available absent some clear and convincing evidence of legislative intention to preclude review." *Japan Whaling*, 478 U.S. at 231 n. 4, 106 S.Ct. at 2866 n. 4. *See also Sierra Club v. Peterson*, 705 F.2d 1475, 1478–79 (9th Cir.1983).

*Id.* at 604 (alteration in original); *see also Hernandez–Avalos v. I.N.S.*, 50 F.3d 842, 846–47 (10th Cir.1995).[8]

The federal APA does not apply to this case but, as we have previously noted at page 358, *supra*, the right to judicial review existed at common law prior to the APA's enactment, and the Superior Court's "civil action" jurisdiction authorizes such review. See page 358–359, *supra*. Accordingly, we agree with the court's reasoning in *Soler* and the other authorities cited, and now turn to the merits of the Sierra Club's claim.[9]

## IV.

### THE MERITS

#### A. The Standard of Review.

■■■■ "A preliminary injunction is an extraordinary remedy, and the trial court's power to issue it should be exercised only after careful deliberation has persuaded it of the necessity for the relief." *Wieck v. Sterenbuch*, 350 A.2d 384, 387 (D.C.1976). In

order to be entitled to a preliminary injunction, the moving party must "clearly" demonstrate

> (1) that there is a substantial likelihood he will prevail on the merits; (2) that he is in danger of suffering irreparable harm during the pendency of the action; (3) that more harm will result to him from the denial of the injunction than will result to the defendant from its grant; and, in appropriate cases, (4) that the public interest will not be disserved by the issuance of the requested order.

*Id.*

[11] The decision to grant or deny a preliminary injunction is confided to the sound discretion of the trial judge. *See id.* We must sustain the judge's factual findings if they are supported by the record. *Id.; see also* D.C.Code § 17–305 (1989); *cf.* Super.Ct.Civ.R. 52(a) ("clearly erroneous" rule). A permissible exercise of discretion must, however, be founded upon correct legal principles, *see, e.g., In re J.D.C.*, 594 A.2d 70, 75 (D.C.1991), and we review the judge's legal rulings *de novo. Quattlebaum v. Barry*, 671 A.2d 881, 884 (D.C.1995) (en banc) (per curiam). Accordingly, "[i]n reviewing a trial court's decision on a motion for [a] preliminary injunction, we [must determine] whether the trial court abused its discretion or rested its analysis upon an erroneous interpretation of the law." *Y.M.C.A. v. Covington*, 484 A.2d 589, 591 (D.C.1984).

#### B. The Contending Positions.

The dispute between the parties with respect to the merits of the preliminary injunction turns largely on the proper construction of the OBSEA. The DCRL, as we have noted, requires the Mayor to provide collection services for separated metal and glass. D.C.Code § 6–3407(d). In April 1995, how-

---

8. As the court explained in *Silveyra v. Moschorak*, 989 F.2d 1012 (9th Cir.1993) (per curiam), *Soler* was vacated as moot by the Supreme Court. The rationale of that case was sound, however, even though its subsequent mooting erases its force as binding precedent. *See Cabuco–Flores v. INS*, 477 F.2d 108, 112 (9th Cir.1973).

*Id.* at 1014 n. 2; *but cf. Urbina–Mauricio v. I.N.S.*, 989 F.2d 1085, 1088 (9th Cir.1993).

9. Our determination that judicial review of DPW's action is available does not, of course, control the scope of that review. See Part IV., *infra*.

ever, as a result of the District's severe fiscal crisis, the Council enacted the OBSEA and amended the DCRL. The OBSEA's preamble states that one of the statutory purposes was "to condition the operation of the recycling program on the availability of appropriations." 42 D.C.Reg. at 2217. Section 504 of the OBSEA states that the provisions of the DCRL "shall only apply to the extent of funds available through the recycling surcharge in [D.C.Code § 6–3415] or appropriated moneys allocated for solid waste management activities." 42 D.C.Reg. at 2229–30.

Prior to the enactment of the OBSEA, the Mayor had submitted to the Council proposed legislation which would have unconditionally authorized suspension of the curbside residential recycling program. In a letter transmitted with his proposal, the Mayor stated that

> [t]his legislation is necessary because the volume of solid waste disposed at the Lorton facility [from which recycling surcharge revenues are derived] is not adequate to fund the recycling program as envisioned under the existing law.

The Council did not enact the amendment proposed by the Mayor, but responded to his concerns by authorizing him to fund the program either from the recycling surcharge revenues or from funds previously allocated to solid waste management activities, and also by conditioning his obligation to continue the program on the availability of funds from those sources. The Council's use of the word "only" in the OBSEA established that the Mayor was not authorized or required to fund the recycling program with funds which the District did not have.

The Sierra Club construes the OBSEA to mean that the Mayor must continue the recycling program so long as there are appropriated funds remaining in DPW's solid waste management budget, regardless of whether those funds are needed for other purposes, such as trash pick-up or alley cleaning. The District argues, on the other hand, that the OBSEA authorizes, but does not require, the

Mayor to use solid waste management appropriations to operate the recycling program.[10] The District insists that, under the OBSEA, the Mayor retains the discretion traditionally accorded him in making budgetary decisions. *See* D.C.Code § 47–310(a)(1), (9) (1990); *cf. Hazel v. Barry*, 580 A.2d 110, 112–14 (D.C. 1990) (holding that the Mayor has the authority to reduce funds allocated to the public library in order to balance the budget, regardless of any sums previously appropriated). According to the District, the question whether funds are "available" from the solid waste management budget must be answered by the Mayor in light of the District's financial condition and the other services, such as trash collection, for which those funds may also be needed.

The trial judge agreed with the Sierra Club. She held that the District had a "nondiscretionary" statutory duty to provide curbside collection of recyclables. She ruled, *inter alia*, as follows:

> Counsel for DPW have acknowledged that there are funds available to the District with which to operate a City-wide residential curbside recycling collection program, as required by the Recycling Law, albeit "insufficient" funds necessary to operate both recycling and solid waste collection for the remainder of the year.

> \* \* \* \* \* \*

> The balance of the hardships, or equities, is a close question, but nevertheless favors the Plaintiff.... [I]f the District is required to continue the recycling program, it clearly has insufficient funds, given the proffered state of the government fisc, to maintain all legislatively mandated programs through the end of the current fiscal year. This hardship, however, is squarely a matter available to the legislature to address and resolve.

### C. Legal Analysis.

■ We agree with the District's position. We do not believe that the OBSEA

---

**10.** On the basis of affidavits by senior DPW officials, the District argues that the only permissible source of funding for the recycling program prior to the enactment of the OBSEA was the revenue collected from the recycling surcharge imposed on solid waste haulers. In light of our disposition, we do not reach this issue.

was intended to *require* the Mayor to continue curbside collection even where, as here, he determined that the consequent diversion of resources from garbage collection and other activities would not be in the public interest. In particular, we conclude that the OBSEA was not intended to authorize the judicial branch to supervise the Mayor's allocation of funds as between various mandated programs when there is simply insufficient money to go around.

The language of the OBSEA is inconclusive. The statute does not say that the Mayor *must* use for recycling the funds allocated for solid waste management. Rather, the overall effect of the legislation is to place a cap on the resources which may be used to fund the recycling program; Section 504 states that "[t]he provisions of [the DCRL] shall *only* apply to the extent of funds available." 42 D.C.Reg. at 2229 (emphasis added). The preamble to the legislation likewise contains a clear expression of the Council's determination that there can be no recycling program if there is no money to pay for it. *See* 42 D.C.Reg. at 2217.

The DCRL, on the other hand, provides that the Mayor "shall provide collection services." D.C.Code § 6–3407(d). The word "shall" is ordinarily (but not always) mandatory, *see Adams v. Braxton*, 656 A.2d 729, 731 (D.C.), *cert. denied*, —— U.S. ——, 116 S.Ct. 168, 133 L.Ed.2d 110 (1995), and repeals by implication are not favored. *Speyer, supra*, 588 A.2d at 1164–65. We conclude that the "plain language" approach will not dispose of this case, for with respect to the issue before us, the Council's language simply is not plain.

In order to discern the Council's intent, we must consider the situation with which the District was confronted at the time the OBSEA was enacted, and we must identify the concerns which the Council was attempting to accommodate. The District was, and is, in a condition of acute financial crisis. Draconian measures, including the imposition of restrictive federal controls, were deemed necessary to bring public expenditures in line with available revenues. The underlying reality was ominous: the District simply lacked the funds required to finance all of the programs mandated by existing legislation.

Notwithstanding the seriousness of the fiscal crisis at the time when the OBSEA was enacted, the demand for ever-increasing expenditures on a variety of programs had not abated. Readers of the daily press and of judicial opinions by our federal and local courts knew that many of our institutions—schools, public housing, prisons, juvenile facilities, mental health facilities, aid to dependent children, foster care, and environmental enforcement, to name a random few—had been the subjects of litigation in which it was alleged that the District had failed to carry out statutory or constitutional obligations, and had not allocated sufficient human or financial resources to mandated programs, some of which were designed to aid very vulnerable segments of our citizenry. The District could not, however, spend money that it did not have. *See* D.C.Code §§ 47–301(a)(1), 47–310(a)(9). If curbside collection of recyclables was not to be discontinued, then some other program would have to be curtailed, and then some other group would doubtless suffer.

The acuteness of the District's fiscal distress had not escaped the notice of the Council. The language of the OBSEA reveals that Councilmembers were reacting in April 1995 to the problem of insufficient funding for mandated programs. In fact, it was the untenable status quo—too many arguably laudable but realistically unaffordable demands upon a vulnerable and shrinking kitty—that the OBSEA was designed to address. Under these circumstances, we think it improbable, if not altogether implausible, to suppose that in enacting a distinctly revenue-conscious measure, the Council intended to *compel* the Mayor to continue the recycling program even if this would mean that there would not be enough money left to collect all of the garbage or to clean alleys, a situation which could have intolerable consequences for residents of the District.[11]

---

11. According to an affidavit by Cellerino Bernardino, DPW's Deputy Director, which was executed on May 9, 1995—after the judge issued her initial preliminary injunction, but before she entered her more comprehensive findings—compliance with the court's order would have caused

To adopt the Sierra Club's construction of the OBSEA would, in our judgment, lead to unreasonable and untenable results. If the Mayor *must* collect the recyclables, then he also *must* pick up the garbage. The judge expressly found that there were "insufficient" funds available to do both. If the Mayor had diverted money from garbage collection and alley cleaning to the recycling program, the Sierra Club or some other public interest litigant presumably could have brought suit to require the Mayor to use DPW's solid waste management funds to pick up trash and clean alleys, necessarily at the expense of the recycling program. Where the District's revenues are insufficient to fund all mandated programs, it surely is not a satisfactory solution to allocate the available money in a manner which accommodates those persons or groups which have sued the District and have brought their suits to judgment, at the expense of others who have been unable to do either. We do not believe that the Council intended the distribution of scarce funds to be determined by the outcome of a race to the courthouse door.

In our recent decision in *Quattlebaum*, we stated:

Especially in times of budgetary crisis, there are many competing claims on the District's limited financial resources. The Council cannot accommodate them all. Hard and painful choices must be made. The constitutional responsibility to make such choices falls upon our elected officials. They, and not the courts, are obliged "to reconcile the demands of ... needy citizens with the finite resources available to meet those demands." *Dandridge v. Williams*, 397 U.S. 471, 472, 90 S.Ct. 1153, 1155, 25 L.Ed.2d 491 (1970). We are not authorized "to second-guess [District] officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients." *Id.* at 487, 90 S.Ct. at 1163. We should accede to a request for judicial intrusion upon what we regard as a core legislative function only if it is plain that the Council's action contravenes the federal legislation upon which appellants rely.

671 A.2d at 885 (alteration in original).

"a shortfall of four trash and garbage routes and there would be no alley cleaning." According to Mr. Bernardino, it would have been "impossible for the District of Columbia to comply with the Order ... without severely compromising other solid waste management programs." Mr. Bernardino described in vivid detail the health hazards posed by uncollected garbage and by uncleaned alleys:

21. Trash and garbage collection and alley cleaning are important for public health and safety.

22. If trash and garbage is allowed to pile up uncollected, it creates public health problems. It is a breeding ground for harmful bacteria and microbes which, if allowed to accumulate or spread, pose a health hazard to humans.

23. If trash and garbage is allowed to pile up, it attracts rats, dogs, cats, raccoons, and opossums. These animals tend to congregate near such piled up trash and garbage. They break into bagged trash and garbage, eating and scattering as they go. These animals can be vectors for trash- and garbage-borne diseases.

24. Piled up trash and garbage also provides nourishment for pest animals (such as rats) that they may not otherwise have, permitting them greater breeding and survival opportunities.

25. Piled up trash and garbage also is a source of other contamination, as fluids or other materials may leak from the trash and garbage into the streets and sewers and, eventually, into the surrounding rivers and the Chesapeake Bay.

26. Piled up trash and garbage, given its moisture content, also provides a breeding ground for unwanted insects, including the mosquito and the fly, both of which are known vectors for a number of diseases.

27. Piled up trash and garbage—especially as warmer weather comes in—is a source of noxious odors.

28. Through the actions of animals and the weather, piled up and uncollected trash and garbage tends to get scattered into the environment, including streets and alleys and yards.

29. Particularly in the inner city area, trash and garbage and litter tends to collect in streets and alleys. If this trash and garbage and litter is not cleaned up at least once per week, it tends to accumulate and has the same public health risks as piled up trash and garbage.

These problems were arguably avoided because, in June 1995, a private contractor took over the recycling program under a contract which provides for implementation "at no cost to the District government." When the Council enacted the OBSEA in April 1995, however, it was not and could not have been aware that this resolution would be available, and its viability in the long run may still be in question.

The present case differs from *Quattlebaum* in that we are not dealing here with a request for judicial interference with legislative responsibilities and prerogatives. Rather, the Sierra Club asks us to second-guess the executive branch as to which mandated programs should be accorded priority when not all of them can be accommodated. The need for judicial restraint, however, is just as pronounced as it was in *Quattlebaum.*

Subject to limitations not here applicable, "the Mayor shall have charge of the administration of the financial affairs of the District." D.C.Code § 47–310(a). He is required, *inter alia,* to apportion all appropriations, funds, and authorizations "so as to achieve the most effective and economical use thereof." § 47–310(a)(9). These are "core" executive functions and, by analogy to *Quattlebaum,* we should "accede to a request for judicial intrusion" only if it is "plain" that the Council intended to restrict the Mayor's authority in this regard. 671 A.2d at 885. We are satisfied that the OBSEA does not reflect such a legislative intention, "plainly" or otherwise.

The trial judge was of the opinion—not an unreasonable one—that if the Council had mandated greater expenditures than the District could afford, then the resulting hardship to the District was "squarely a matter available to the legislature to address and resolve." But even if we were to assume, as the trial judge suggested, that the Council ought to have curtailed its mandated programs to address the fiscal crisis, that does not resolve the question before us. We must decide the case under the law as it stands now. We conclude that the OBSEA does not require the Mayor to maintain the curbside collection program in effect where the Mayor has determined that funds are not "available" to pay both for that program and for DPW's other solid waste management responsibilities.[12]

### D. The Mayor's Exercise of Discretion.

The Sierra Club contends, as an alternative ground for affirmance, that even if the Mayor is vested with authority under the OBSEA to determine the extent to which funds are "available" for recycling from DPW's solid waste management budget, he acted unlawfully in this case. According to the Sierra Club, the District did not and could not show that funds were unavailable for recycling, for it would be more expensive for the District to cancel the recycling program than to continue it.

We have held in Part III. of this opinion that the District's suspension of the curbside collection program was subject to judicial review. The initial question presented was whether the DCRL *required* the Mayor to continue the recycling program. That question, we concluded, was not committed to the Mayor's absolute discretion, nor did the DCRL clearly preclude judicial review.

 The question we are now addressing is quite different. The court having ruled that the OBSEA did not deprive the Mayor of his discretionary authority to allocate the expenditures of the DPW as between recycling and other activities, including garbage collection and alley cleaning, we are dealing here with an alternative or "fall-back" argument in which the Sierra Club is effectively seeking to challenge the Mayor's exercise of discretion in the expenditure of public funds. Essentially, the Sierra Club is asking the court to second-guess the Mayor as to whether the recycling program is cost-effective, and to order him to continue residential curbside collection notwithstanding the Mayor's determination that no funds are "available" to pay for it without unacceptable risks to public health. For all practical purposes, the Sierra Club is demanding that the court assume responsibility for managing at least a part of the District's budget. The various parts of a budget are interdependent, however, and enforcement of such an order would potentially entangle the court even further in

---

12. We have no occasion to reach the question whether, if the DCRL had not been amended by the OBSEA, the Mayor would have had the authority to suspend the residential curbside collec-

tion program based upon a determination that the District lacked sufficient funds to operate the program. In that connection, however, *cf.* Part IV. D, *infra.*

concerns which are not the province of the judicial branch.

The doctrine of separation of powers restrains courts from "inappropriate interference in the business of the other branches of Government." *United States v. Munoz–Flores*, 495 U.S. 385, 394, 110 S.Ct. 1964, 1970, 109 L.Ed.2d 384 (1990). Whether for lack of judicial power or for prudential reasons, a court will stay its hand where, *inter alia*, it would be impossible to "undertak[e] independent resolution without expressing lack of the respect due coordinate branches of government." *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962). The occasion for restraint is surely at its apogee when the court is asked to dictate the Mayor's spending priorities.

We decline, under these circumstances, to weigh the elaborate arguments which the parties have presented to us as to whether or not the recycling program pays for itself.[13] That is a determination for the elected branches of the government, and as we read the DCRL as amended by the OBSEA, it has been confided to the discretion of the Mayor under the circumstances of this case.

### V.

### CONCLUSION

■ The foregoing analysis controls the proper application of the four-part test of *Wieck, supra*, 350 A.2d at 387. The court having rejected the Sierra Club's principal legal contention—namely, that the Mayor must continue to fund the recycling program even if this would require curtailment of garbage collection and alley cleaning—the Sierra Club has not demonstrated, "clearly" or at all, that it is likely to succeed on the merits. Indeed, in light of our principal holding, the possibility that the Sierra Club would prevail at trial is so remote that we need not address the remaining *Wieck* factors. *See, e.g., Texas v. Seatrain Int'l, S.A.,*

518 F.2d 175, 180 (5th Cir.1975); *Gallo v. Brown*, 446 F.Supp. 45, 48 (D.R.I.1978).

Accordingly, each of the orders granting injunctive relief is vacated and the case is remanded to the trial court for proceedings consistent with this opinion.

*So ordered.*

---

13. We note that the trial judge addressed the question whether the District had enough money to continue the recycling program. She wrote that "if the District is required to continue the recycling program, it clearly has insufficient funds, given the proffered state of the government fisc, to maintain all legislatively mandated programs through the end of the current fiscal year." The judge thus found, at least implicitly, that the recycling program constitutes a substantial cost for the District.