**James WALTON, Appellant,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

No. 93–CV–1275.

District of Columbia Court of Appeals.

Argued Oct. 19, 1995.

Decided Feb. 1, 1996.

Robert C. Hauhart, Washington, for appellant.

Mary L. Wilson, Assistant Corporation Counsel, with whom Garland Pinkston, Jr., Acting Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellee.

Before FERREN, SCHWELB, and REID, Associate Judges.

Opinion for the court by Associate Judge REID.

Concurring opinion by Associate Judge FERREN at p. 1356.

Concurring opinion by Associate Judge SCHWELB at p. 1358.

REID, Associate Judge:

This case raises issues regarding disciplinary punishment of a Lorton Correctional Facility inmate and the procedural rights governing the disciplinary process. Appellant James Walton challenges a trial court decision affirming a disciplinary ruling of the Department of Corrections. The Department subjected Walton to fourteen days of adjustment segregation for violations of reg-ulations prohibiting possession of contraband, and abuse of privileges. Walton filed an action against the District of Columbia, the Department and officials of the Department under 42 U.S.C. § 1983 (1979), and under D.C.Code §§ 11–921(a)(2) and (a)(3)(C) (1981) asserting violations of the Department's regulations,[1] the Lorton Regulations Approval Act of 1982 ["LRAA"], 28 DCMR Chapter 5 (1987). The trial court remanded the matter to the Department for a written statement of findings. After considering the response of the Department to its remand, the trial court ruled that Walton's "complaint fails to state a claim of constitutional deprivation of due process rights," and concluded the "defendants have now complied with the pertinent provisions of the [LRAA]." Accordingly, the trial court granted the Department's Motion for Summary Judgment. We see no error in the trial court's ruling.

## FACTUAL SUMMARY

On January 19, 1992, Officer Williams, a correctional officer at the Lorton Correctional Complex, detected a smell coming from a cell occupied by inmate Walton. Officer Williams notified the officer-in-charge, Sergeant Bonaparte, who in turn inspected Walton's cell and found gallons of a liquid substance in a plastic bag. The substance later

---

1. 42 U.S.C. § 1983 is a civil rights statute which prohibits a person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia" from depriving another "of any rights, privileges, or immunities secured by the Constitution and laws...." Monetary damages and injunctive relief may be awarded under § 1983. Walton's citation to D.C.Code § 11–921(a)(3)(C), pertaining to the jurisdiction of the Family Division of the Superior Court, probably was an inadvertent error. Moreover, he contends that his action was neither brought nor required to be brought under D.C.Code § 11–921(a)(3)(A)(iii) which refers to the habeas corpus statute, D.C.Code § 16–1901 (1989). He cites D.C.Code § 11–921(a)(2). However, § 11–921(a)(2) has now expired and cannot serve as a basis for the trial court's jurisdiction over Walton. He did not cite D.C.Code §§ 11–921(a) or 11–921(a)(6) which generally provide for the Superior Court's general jurisdiction. Section 11–921(a) states:

"Except as provided in subsection (b) [referring to Federal jurisdiction and jurisdiction over civil actions during the transition period to the then new court system], the Superior Court has jurisdiction of any civil action or other matter (at law or equity) brought in the District of Columbia...."

Section 11–921(a)(6) provides that:

Immediately following the expiration of the thirty-month period beginning on ... [the effective date of the District of Columbia Court Reorganization Act of 1970], the court has jurisdiction (regardless of the amount in controversy) of any civil action or other matter, at law or in equity, brought in the District of Columbia.

We do not need to decide whether a prisoner may rely on §§ 11–921(a) or 11–921(a)(6) to challenge the conditions of his confinement. We conclude later that Walton could properly bring his case in Superior Court as a habeas corpus proceeding under § 11–921(a)(3)(A)(iii) which refers to the habeas corpus statute, D.C.Code § 16–901.

was found to be grapefruit juice in the process of fermenting. Tests on the juice revealed an alcohol content of less than one percent.

## A. The Department's Disciplinary Action and Procedures

The Department issued a Disciplinary Report to Walton on the same day as the incident. The Disciplinary Report, signed by Officer Williams, contained three charges against Walton: (1) possession of major contraband (a Class I offense) in violation of 28 DCMR § 502.11;[2] (2) possession of contraband (a Class II offense) in violation of 28 DCMR § 503.10;[3] and (3) abuse of privileges (a Class III offense) in violation of 28 DCMR § 504.4.[4] Under 28 DCMR § 505, one of the penalties that is authorized for Class I, II, and III offenses is: "Assignment to adjustment segregation . . . for a period not to exceed fourteen . . . days" (28 DCMR § 505.2) in the case of Class I and II offenses or seven days in the case of a Class III offense (28 DCMR § 505.3(a)).[5] On January 20, 1992, the Department sent Walton a memorandum regarding the charges contained in the Disciplinary Report. The memorandum summarized the Disciplinary Report and advised Walton of the approximate date of his hearing on the charges contained in the Disciplinary Report. It also included Walton's statement concerning the charges against him, as follows: "It was not seven gallons. It was approx. two gallons." In addition, the memorandum reflects the fact that Walton asserted his "desire" to have representation at the hearing, his "desire" to have Sergeant Bonaparte at the hearing but not the writer of the Disciplinary Report, his "desire" to have witnesses present, and his "wish" to be heard by an Adjustment Board instead of a Hearing Officer.[6] Walton's signature appears at the bottom of the January 20, 1992, memorandum.

A hearing on the charges against Walton took place on January 28, 1992, before the Adjustment Board ("the Board"); the Chair of the Board was Corporal Ernestine Tillman.[7] Walton testified at the hearing and called two witnesses: Sergeant Bonaparte, who inspected his cell after the odor was reported by Officer Williams, and Dr. John Seipel, a medical officer at Lorton who testified regarding the fermentation of fruit juice and the possibility of intoxication from the liquid found in Walton's cell. The Department introduced the Disciplinary Report, but did not call Officer Williams (the author of the Report) to testify. In addition, the Department presented documentary evidence which revealed that the alcohol content of the

---

2. 28 DCMR § 502.11 provides, in pertinent part: "[t]he Class I offense of *possession of major contraband* shall be defined as follows: . . . (b) Possession of, making, or attempting to make any intoxicating beverage. . . ."

3. 28 DCMR § 503.10 specifies in pertinent part: "The Class II offense of *possession of contraband* shall include the following: (a) Possession of any article that'has not been issued by the institution, purchased from the canteen, or specifically authorized by the Administrator; (b) Use of any article in a manner contrary to the intent or provisions of issuance, purchase, or authorization. . . ."

4. 28 DCMR § 504.4 provides: "[t]he Class III offense of *abuse of privileges* shall include the following: (a) willfully violating the provisions of any institutional regulation dealing with a privilege. For purposes of this subsection, a 'privilege' shall be defined as any benefit conferred upon the inmate populace by institutional regulations; or (b) taking excess food from the serving line in the dining hall or abusing dining privileges."

5. 28 DCMR § 505.4 defines adjustment segregation as: "confinement in a control cell without privileges, but with uncensored correspondence, access to religious and legal reading matter, and at least two (2) hours per week of out-of-cell recreation; Provided, that recreation may be restricted due to extraordinary safety and security risk."

6. Under 28 DCMR §§ 508.2 and 509.1, an inmate may choose to have his disciplinary action heard by a single hearing officer, or a three person Adjustment Board.

7. The Adjustment Board was convened pursuant to 28 DCMR § 509. Section 509.2 specifies that: "The Adjustment Board shall consist of three (3) Department of Corrections officials who are impartial and have not been involved in any way in the offense which caused the proceedings and who have not participated in the investigation of allegations." Corporal Tillman was sued in this action, but no complaint was filed against the other two members of the Board.

grapefruit juice in Walton's cell was less than one tenth of one percent.

The only factual disagreement during the hearing appeared to be the number of gallons of liquid found in Walton's cell. The Disciplinary Report calculated the amount as "about seven gallons." Walton insisted that only two gallons were found in his cell. During his oral testimony, Sergeant Bonaparte's estimate ranged from seven or eight to fourteen or fifteen to thirty-four gallons.[8]

After all testimony and evidence had been received, the Adjustment Board deliberated. It stated its "finding and recommendation" in writing as follows: " 'Guilty' based on documentation. Recommend fourteen days [Adjustment] segregation. Return to former status after completion of [Adjustment] segregation. Resident does wish to appeal. Return to former status ... after time." Although the Board recommended fourteen days of adjustment segregation, it did not recommend any "forfeiture of all or part of [Walton's] earned good time" under 28 DCMR § 505.2(a).[9] The Board informed Walton of its decision orally, and sent him a copy of the written statement.

### B. Walton's Appeal to the Department

On January 31, 1992, Walton sent a letter to Douglas Stempson, the Administrator of the Maximum Facility at Lorton, appealing the Board's findings with respect to the charges of: (1) possession of major contra-

band and (2) possession of contraband.[10] Walton contended that under the definition of "intoxicating beverage" he could not have been found guilty of "possession of major contraband", given the testimony of Dr. John Seipel. Moreover, he maintained that he could not be guilty of "possession of contraband" because (1) he had been given the juice by Department personnel, (2) Dr. Seipel testified that juice begins to ferment immediately at room temperature, and (3) the Department failed to introduce any evidence that the juice had been altered by distillation. Mr. Stempson denied Walton's appeal on February 4, 1992.[11] Walton raised no issue in his appeal to Mr. Stempson, regarding the issuance of the Board's written decision or the timeliness of Walton's receipt of that decision.[12]

### C. Walton's Complaint and the Trial Court's Proceedings

Walton filed suit in Superior Court on July 14, 1992 under 42 U.S.C. § 1983, and D.C.Code §§ 11–921(a)(2) and (a)(3)(C), see, *supra*, note 1, naming as Defendants the District of Columbia, the Department, and Walter Ridley, Director of the Department, Douglas Stempson and Ernestine Tillman in their official capacities. His complaint labeled his claims in two categories: (1) legal claims and constitutional violations and (2) statutory violations. With respect to the first category, he invoked the Fourteenth Amendment[13] to the United States Constitu-

---

8. Part of the problem in estimating the number of gallons found may be traceable to the fact that the liquid was in a plastic bag.

9. Under 28 DCMR § 505.2(a), an inmate found guilty of a Class II (major offense) violation could be punished with the "forfeiture of all or part of earned good time."

10. Walton never contested the abuse of privileges charge.

11. In denying the appeal, Mr. Stempson wrote "Resident Walton was in possession of seven gallons of fruit juice with an alcoholic content of approximately one percent. Your contention seems to be that the [sic] 'shoots' were discovered too soon. If we had waited the fermentation would have increased the alcoholic content and thus enable him to become intoxicated when drunk. I find your argument totally unacceptable and deny this appeal."

12. 28 DCMR § 512.7 provides that: "The [Adjustment] Board shall issue a decision in writing stating its findings as to the resident's involvement, the factual information upon which the finding is based, and, if the resident has been found guilty, the penalty to be imposed and notice of the resident's right to appeal under § 513." 28 DCMR § 512.10 provides that: "The resident shall receive a copy of the written decision within three (3) working days of the hearing."

13. Walton invoked the Fourteenth Amendment instead of the Fifth Amendment which is applicable to the District of Columbia. However, courts approach the due process and equal protection clauses of the Fifth and Fourteenth Amendments in a similar manner with respect to certain issues. *See District of Columbia v. Mayhew*, 601 A.2d 37, 43 (D.C.1991); *Adarand Constructors Inc. v. Pena*, —— U.S. ——, ——–——, 115 S.Ct.

tion and asserted two basic constitutional challenges to the Board's disciplinary action: (1) "[T]he Adjustment Board gave no written statement to satisfy the minimum requirements of constitutional due process"; and (2) "[T]here was an insufficient written statement as to the evidence relied upon and the reasons for disciplinary action in Administrator Stempson's February 4, 1992, letter denying his appeal." Hence, his constitutional challenge rested, as his complaint indicated, on that aspect of *Wolff v. McDonnell,* 418 U.S. 539, 564, 94 S.Ct. 2963, 2978, 41 L.Ed.2d 935 (1974), which requires a "written statement by the fact finders as to the evidence relied on and reasons for the disciplinary action."

With regard to the second category of his claims, Walton's complaint asserted a violation of five sections of the LRAA pertaining to: (1) the person who should sign the disciplinary report (28 DCMR § 506.3 specifying that: "the accusing official who has investigated an alleged offense shall fill out and sign a disciplinary report...."); (2) the requirement of a written report (28 DCMR § 512.7 requiring that the decision state: "its findings as to the resident's involvement, the factual information upon which the finding is based, and ... the penalty to be imposed...."); (3) the standard of review for an appeal (28 DCMR § 513.2 requiring a review based upon a reasonable assessment of the evidence presented); (4) the insufficiency of evidence to meet the definition of major contraband, as set forth in 28 DCMR § 502.11(b); and (5) the insufficiency of evidence to meet the definition of possession of contraband as defined in 28 DCMR § 503.10. Walton sought a declaratory judgment that defendants violated his constitutional and statutory rights. He also asked that the disciplinary decision against him be vacated and that any record of the matter be expunged.

In an order docketed on April 21, 1993, the trial court remanded the matter to the Department's Adjustment Board for issuance of "written findings pursuant to § 112.6 of the LRAA, 28 DCMR § 512.7." As reasons for the remand, the trial court included the following clause:

[I]t appearing to the Court that the Adjustment Board has not issued a written statement of findings setting forth the reasons for its disciplinary action as required by § 112.6 [28 DCMR § 512.7] of the Lorton Regulations Approval Act of 1982

. . . .

The Board issued a revised statement, which the District of Columbia filed on July 2, 1993. Subsequently, the trial court granted summary judgment in favor of the District of Columbia. The trial court's August 13, 1993, order concluded in part that: "[a]ccepting all of plaintiff's factual allegations as true, the complaint fails to state a claim of constitutional deprivation of due process rights and it further [appears] to the court that defendants have now complied with the pertinent provisions of the ... [LRAA]." Walton noted an appeal.

## ANALYSIS

Walton's appeal brief raises three issues for review: (1) whether the trial court erred by remanding the case to the Adjustment Board for a written statement of the evidence relied on fifteen months after the Board's disciplinary hearing; (2) whether the trial court erred in concluding that the complaint failed to state a claim of constitutional deprivation, accepting all of plaintiff's factual allegations as true; and (3) whether the trial court erred by concluding that defendants had complied with pertinent provisions of the LRAA by submitting the Adjustment Board's written statement of July 2, 1993. He identifies the alleged violations of the LRAA as those stated in his complaint, discussed above in the factual summary.

## I.

■ The trial court concluded that Walton's complaint failed to state a claim of constitutional deprivation of due process rights, and that the Department had com-

2097, 2105–08, 132 L.Ed.2d 158 (1995); *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954); and *Wolff v. McDonnell,*

418 U.S. 539, 555–58, 94 S.Ct. 2963, 2974–75, 41 L.Ed.2d 935 (1974).

plied with the LRAA. Not only does Walton challenge these conclusions, but he also asserts that the trial court erroneously granted the Department's Motion for Summary Judgment. These are all questions of law, and therefore our review is *de novo*. *See Johnson–El v. District of Columbia*, 579 A.2d 163, 166 (D.C.1990). In reviewing a motion for summary judgment, "we must assess the record independently.... [and view it] in the light most favorable to the party opposing the motion." *See Colbert v. Georgetown University*, 641 A.2d 469, 472 (D.C.1994) (en banc).

## II.

■ Walton's alleged "legal claims and constitutional violations" and his alleged "statutory violations" are related. We turn first to his "statutory violations" or his assertions regarding the Department's alleged violations of the LRAA, and the trial court's alleged errors regarding its rulings on those violations. First, we must determine the basis of the Superior Court's jurisdiction over Walton's challenge regarding the Board's application of the LRAA. We refer to this challenge as Walton's "regulatory challenge." Walton asserts jurisdiction under D.C.Code §§ 11–921(a)(3)(C) and 11–921(a)(2), discussed in footnote 1. He presents no facts or arguments in this court which suggest that the case was properly before the trial court under D.C.Code § 11–921(a)(3)(C) which gives the Superior Court jurisdiction over cases "brought under chapter 23 of title 16", regarding family matters, including detention of juveniles. Moreover, he cannot obtain jurisdiction under § 11–921(a)(2) because it has expired. See, *supra*, note 1. Nor can Walton bring his regulatory claims under § 1983, as they are based solely on District of Columbia law and do not impli-

cate the constitution or a federal statute. *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980). Nonetheless, for the reasons set forth in the companion case of *Abdullah v. Roach*, 668 A.2d 801 (D.C.1995), we conclude that the Superior Court may properly review the Department's disciplinary decisions which allegedly violate the LRAA. The government asserts that Walton's action should be construed as a habeas corpus proceeding because "habeas is the exclusive remedy for a state prisoner challenging his detention." We did not take that position in *Vaughn v. United States*, 598 A.2d 425 (D.C.1991), and decline to do so now.[14]

### A. Jurisdiction

■ Although the LRAA does not provide for judicial review of a prison disciplinary decision under the "contested case" jurisdiction of D.C.Code §§ 1–1509, –1510, we are satisfied that Walton's regulatory challenge could be raised properly in Superior Court as a petition for habeas corpus. Following *Abdullah, supra*, 668 A.2d 801 (D.C.1995), we recognize that habeas corpus reaches "not only the fact but also the form of detention." 668 A.2d at 809.

■ One of the requirements of habeas corpus jurisdiction is the exhaustion of administrative remedies. *Murray v. Stempson*, 633 A.2d 48, 49 (D.C.1993). Here Walton's appeal to the Department did not raise any issue regarding the issuance of the Adjustment Board's written statement under 28 DCMR § 512.7. Nor did his appeal letter to Administrator Stempson raise any issue concerning the failure of the accusing official to fill out and sign the disciplinary report under 28 DCMR § 506.3.[15] The government maintained that "Walton did not challenge the

14. In *Vaughn, supra*, 598 A.2d at 431 (D.C.1991), we stated:

> this court has not viewed [habeas corpus] as the exclusive means by which [a prisoner] may present his view of the constitutional and regulatory deficiencies in the disciplinary proceedings.

In fact, in *Vaughn*, we permitted an inmate to appeal from a trial court decision which sustained a decision of the Department. However, in *Vaughn*, the inmate raised his issue, regarding

the Department's determination of "no-further-benefit" from youth offender status, before the sentencing judge under D.C.Code § 24–805.

15. However, Walton did challenge the sufficiency of the evidence to find him guilty of "possession of major contraband" or "possession of contraband." There is a logical connection between Walton's challenge to the sufficiency of the evidence to find him guilty of a disciplinary infraction and the requirement, set forth in 28 DCMR § 512.7, that the Adjustment Board issue a writ-

adequacy of the disciplinary board's written decision in his internal appeal to the administrator and therefore should be precluded from raising the issue here."[16] However, he did raise an issue as to whether the appeal Administrator's decision was "based upon a reasonable assessment of the evidence presented", as required by 28 DCMR § 513.2.

■ After Walton filed his complaint in the trial court, the trial judge remanded the matter to the Department because "it [appeared] to the court that the Adjustment Board has not issued a written statement of findings setting forth the reasons for its disciplinary action as required by § 112.6 [28 DCMR § 512.7] of the Lorton Regulations Approval Act of 1982." The remand was not error because in order to rule on the reasonableness of the administrative appellate decision, the trial court believed that it needed a clear written statement to assess the sufficiency of the evidence. After the Department filed its response to the trial court's remand, Walton argued that: (1) the trial court erred in remanding the matter; (2) the Board's second statement was inadequate factually and legally, and (3) the Board's second statement was only signed by two of the three Board members in violation of 28 DCMR § 512.9 which requires the three Board members to sign, and was not issued within three working days of Walton's hearing, as required by 28 DCMR § 512.10.

## B. Factual and Legal Adequacy of the Board's Second Statement

■ We defer consideration of Walton's first argument at this juncture of our deci-

sion. The second argument concerns the factual and legal adequacy of the Board's second statement.[17] The adequacy of the second statement insofar as it bears upon the trial court's determination that sufficient evidence existed to support the Board's order, is clearly before us on appeal, regardless of whether Walton initially exhausted his administrative remedies on the first written statement. The trial court determined that the second written statement "complied with the pertinent provisions of the LRAA." The trial judge did not explain the basis for his conclusion, but incorporated by reference the arguments contained in "the reply of the defendants ... in opposition to plaintiff's Motion For Summary Judgment, defendants' Cross-motion to Dismiss the complaint, the defendant's response to the court's April 21, 1993, order, the memorandum of points and authorities filed in support therefore, and the entire record...." The Board's second statement, although not the model of clarity, noted that "Walton admitted to have had [sic] shoots [homemade wine] in his cell."[18] The trial court was, therefore, correct in concluding that the second written statement contained the "Board's finding as to the resident's involvement", and "the factual information upon which the finding is based", as required by 28 DCMR § 512.7.

■ Assuming that all of Walton's factual allegations are true, the record reveals that Walton admitted to having at least two gallons of grapefruit juice in his cell at Lorton,

---

ten statement of its findings, including the factual information on which the findings are based. There is also a logical connection between the challenge to the sufficiency of the evidence and the requirement, set forth in 28 DCMR § 513.2 that the appeal decision be "based upon a reasonable assessment of the evidence presented." Walton argues that the administrative appeal could not have been based on a reasonable assessment of the evidence presented because the evidence was not sufficient to support the decision.

**16.** Arguably, Walton may have been able to bring his case under D.C.Code § 11–921(a). See *supra* n. 1. However, in principle he still would have had to exhaust his administrative remedies. But *see District of Columbia v. Group Insurance Ad-*

*ministration,* 633 A.2d 2, 20–21 (D.C.1993). Even if there are instances where exhaustion is not required for a civil action over which the trial court has jurisdiction under D.C.Code § 11–921(a), we are satisfied that, given the comprehensive administrative scheme under the LRAA, Walton's failure to exhaust his remedy for an alleged violation of 28 DCMR § 506.3 bars litigation of that issue in court.

**17.** We do not decide whether the Board's first written statement was inadequate, or whether any particular form is essential with respect to the written statement required by 28 DCMR § 512.7.

**18.** Walton also contests the truth of this statement, which we address below.

in a container.[19] He denied that the substance was homemade wine, but did not deny that there was a smell in his cell. Although the alcoholic content of the juice was found to be less than one percent, 28 DCMR § 502.11 defines "possession of major contraband" to include "possession of, making, or attempting to make any intoxicating beverage." In addition, 28 DCMR § 503.10 defines "possession of contraband" to include "use of any article in a manner contrary to the intent or provisions of issuance, purchase or authorization...." Based upon Walton's admission that there were two gallons of grapefruit juice in a container in his cell and his failure to deny the smell in his cell, the Board and the trial court could reasonably conclude that a prisoner who accumulates two gallons of grapefruit juice in a container in his cell and who fails to deny that there was a smell in his cell, attempted to make an intoxicating beverage. With respect to the charge "abuse of privileges" in violation of 28 DCMR § 504.4, Walton conceded that he retained the fruit juice in his cell without permission. Hence, there was ample factual evidence that Walton violated the LRAA, as charged. Accordingly, neither the Board's second written statement, nor the trial court's August 13, 1993, order was factually or legally inadequate.

### C. Board Signatures and Issuance of the Second Statement

We turn next to Walton's third regulatory argument regarding the Board's second statement, filed on July 2, 1993. He contends that this statement is fatally defective because it contains only two hearing board member signatures, instead of three; and because it was not issued within three working days of his January 28, 1992, hearing.[20] There is a threshold question as to whether the exhaustion of remedies doctrine applies to Walton's third argument, or whether he has properly raised two new issues generated by the Board's second statement.

This question need not detain us. We need not decide whether Walton sufficiently exhausted his administrative remedies in light of the particular facts of this case, or whether, under the circumstances, he should be permitted to raise issues in the Superior Court which were not argued to the agency, because even if his substantive contentions are properly before us, they fail on the merits. Walton's third argument simply has no merit. The explanation for only two signatures on the second Walton statement is clear and the absence of one signature has not resulted in any prejudice to Walton, or any miscarriage of justice. The third member of the Board had left the Department by the time the second written statement was released. Moreover, the second statement is not remarkably different from the documents that comprised the first one, except with respect to form. Furthermore, the only reason the second statement was issued more than three days after Walton's hearing is Walton's challenge to the sufficiency of the evidence to find him guilty. On the facts before us, it would be unreasonable to conclude that the Board's disciplinary decision should be reversed on such a ground. Accordingly, we reject Walton's third regulatory argument, and affirm the trial court's ruling that the Department complied with its regulations.

### III.

Since Walton's regulatory challenge fails, we turn next to his constitutional challenge under 42 U.S.C. § 1983. Unlike his regulatory challenge, Walton is not required to demonstrate exhaustion of administrative remedies with respect to his § 1983 challenge.[21] However, for his claim to be cognizable under § 1983, Walton must prove that: (1) some person has deprived him of a federally protected right, and (2) the person who deprived him of a federal right acted

---

19. The Department indicated that the juice was found in a plastic bag, contained fragments of whole fruit, and was wrapped in his mattress cover and blanket.

20. There was no administrative hearing after remand, and the record does not indicate that

Walton requested one. The Board simply rewrote and re-issued its first written statement finding Walton guilty of the regulatory violations.

21. See *Patsy v. Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982).

under color of state or territorial law. *Gomez v. Toledo, supra,* 446 U.S. at 640, 100 S.Ct. at 1923. Walton claims a federally protected right to receive a "written statement by the fact finders as to the evidence relied on and reasons for the disciplinary action." *Wolff v. McDonnell,* 418 U.S. 539, 564, 94 S.Ct. 2963, 2978–79, 41 L.Ed.2d 935 (1974). The trial court ordered, and the Board supplied after remand, a new written statement. In essence, Walton asserts that the Department could never "cure" any original failure to issue the required written statement without violating his liberty interest under the [Fourteenth] Fifth Amendment. We disagree and hold that whatever kinds of liberty interest are deemed protected by the Supreme Court after *Sandin v. Conner,* 515 U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the process afforded Walton, given the interest and sanction at issue here, comported with the requirements of the Constitution.

Accordingly, the trial court's decision is

*Affirmed.*

FERREN, Associate Judge, concurring:

I concur in Judge REID's opinion but write separately because I believe Part II.C., discussing "whether the exhaustion of remedies doctrine applies to Walton's third argument," *ante* at 1355, requires further elaboration:

The question whether a plaintiff has exhausted administrative remedies before coming to court is not a jurisdictional inquiry, since "exhaustion of remedies is a 'flexible doctrine' subject to 'a number of interrelated exceptions.'" *District of Columbia v. Group Insurance Administration,* 633 A.2d 2, 20 (D.C.1993) (citation omitted); *see Tenants of 1255 New Hampshire Avenue, N.W. v. District of Columbia Rental Housing Commission,* 647 A.2d 70, 76 (D.C.1994). Nonetheless, in a case such as this where we have stressed that exhaustion is required before the trial court can consider an issue, see *ante* at [1353–54] & n. 16, I am reluctant to reach the merits merely by assuming an exception or some other explanation applies such that "[w]e need not decide whether Walton suffi-

ciently exhausted his administrative remedies." *Ante* at 1355.

As analysis of the record makes clear, under the unusual circumstances of this case, Walton had no administrative remedies to exhaust on the two issues embraced by his third argument: (1) whether the Adjustment Board's second written statement "is fatally defective because it contains only two hearing board member signatures, instead of three"; and (2) whether that statement also is defective "because it was not issued within three working days of his January 28, 1992, hearing." *Ante* at 1355 (footnote omitted). The trial court, therefore, properly considered these issues on their merits, as do we.

Here is what happened. Walton was charged with violating prison regulations that essentially forbid an inmate's making, or attempting to make, alcoholic beverages. He defended on the ground that the evidence was insufficient to support the claimed violations. A three-member prison Adjustment Board found Walton guilty of the charged infractions. He appealed to the prison Administrator pursuant to 28 DCMR § 513.9. Walton essentially repeated on appeal his contention that the evidence was insufficient. The Administrator denied the appeal, and Walton accordingly filed suit in Superior Court. In his complaint, Walton alleged that the original written statement violated a number of regulations, including 28 DCMR § 512.7, which requires a written statement of the Board's "findings as to the resident's involvement, [and] the factual information upon which the finding is based." Walton also repeated the evidentiary sufficiency arguments he had alleged in his administrative appeal. The trial judge found that "the Adjustment Board has not issued a written statement of findings setting forth the reasons for its disciplinary action as required by [28 DCMR § 512.7]" and therefore remanded the matter to the Adjustment Board "to issue its written findings pursuant to [§ 512.7]." The trial court further ordered that "all other motions are held in abeyance until defendants comply with the Court's remand order."

Although the trial judge apparently remanded the matter to the Adjustment Board because the original written statement did not satisfy § 512.7, as Walton had alleged—for the first time—in his lawsuit, it is also clear that the trial judge believed he could not adequately review for evidentiary sufficiency without a more detailed statement of the Board's findings and conclusions. See *ante* at 1352–53. The judge was saying, in effect, that he could not review for sufficiency without an adequate written explanation on of what had happened and of why Walton's conduct violated the charged disciplinary regulations. Although Walton himself had never contended on appeal to the Administrator that the written statement regulation, § 512.7, had been violated, the judge effectively ruled—and this court sees no reason for doubting—that evidentiary sufficiency could not be resolved in this case without a written statement, which had not been provided, meeting the requirements of § 512.7.

The Board reconvened, prepared a more detailed written statement, and sent that statement directly to the trial judge, as requested. Because the statement did not go to the judge through the Administrator, Walton had no administrative remedy to exhaust with respect to it.[1] For all practical purposes, Walton received the statement in the same July 1993 delivery that transmitted the statement to the trial judge. Upon receipt of the revised written statement, the court *sua sponte* resumed consideration of the remaining pending motions and, on August 13, 1993, denied Walton's motion for summary judgment and granted the defendant's cross-motion for summary judgment. Because of the procedures employed in this case, therefore, the only place that Walton effectively could challenge the statement was in court. *See*

*Tenants of 1255 New Hampshire Avenue, N.W.,* 647 A.2d at 76 (after remand, "[t]here was no adverse ruling by the Rent Administration from which the tenants could appeal to the Commission").

As it turned out, the second written statement contained only two of three required signatures, *see* 28 DCMR § 512.9, so Walton complained to the court that the statement violated that procedural regulation.[2] It was entirely proper for Walton to raise this issue with the trial court in the first instance, since the remand proceeding did not create any opportunity for an administrative remedy of the Board's alleged violation of § 512.9. *See id.* A challenge to the number of signatures, moreover, is not necessarily frivolous, for without all the required signatures there is no assurance that the statement represents the considered views of all Board members.[3]

Theoretically, I suppose, one could argue that Walton's failure to challenge the Board's first written statement when he initially appealed the Board's ruling to the Administrator means that Walton has waived all claims of administrative irregularity in issuing the Board's written ruling—even the second one the trial judge requested. But that argument would fail. Once the trial court has ruled, in effect, that the prisoner's evidentiary sufficiency claim cannot be resolved without a more comprehensive written statement, the prisoner must be entitled to challenge the adequacy of that statement on any ground the regulations permit; otherwise, the Board again might supply a defective document—in this case unreviewed by the Administrator—that effectively frustrates the court's need for assurance that the statement procedurally and substantively provides

1. By ordering that the Board submit the revised written statement directly to the trial court, the court's order apparently also circumvented the procedural safeguard ensured by 28 DCMR § 513.1, which requires the Administrator (or the Administrator's designee) to "review all decisions rendered by the Adjustment Board or by hearing officers."

2. Walton also complained that the statement violated 28 DCMR § 512.10 because it had not been issued within three days of Walton's hearing be-

fore the Board. That contention is frivolous in view of the fact that Walton had never complained that the first Board ruling had been untimely and that the regulation obviously was not directed at the period during which the case is on appellate review of the Board's ruling.

3. Indeed, if only one signature had accompanied the statement, that fact would support a substantial argument that the statement on its face did not reflect the views of a Board majority.

an adequate record for reviewing sufficiency of the evidence.

The difficulty here could have been avoided if the trial judge had followed the usual path, remanding the record—or the case—to the Administrator, who would be responsible for transmitting the request to the Board. The Board would then have issued its written statement to the Administrator, who would have ruled on its adequacy before sending the statement along to the court. Presumably, as part of that standard remand procedure, the prisoner, Walton, would have had an opportunity to argue to the Administrator about the adequacy of the second written statement; *i.e.*, the prisoner would have had an administrative remedy to exhaust during remand, before the court resumed the proceeding. But that approach was not taken here. By dealing directly with the Board, the trial judge cut the prison Administrator out of the process and precluded Walton from seeking an administrative remedy before the judge took up the merits of Walton's remaining claims in the light of the new written statement.

I believe that, in some circumstances, when a prisoner brings a § 512.9 issue to the court, the trial court will have to remand for the required signatures, in order to be sure that the statement reflected the considered findings and conclusions of the entire Board. Under applicable regulations, see *ante* at note 6, a prisoner has the right to select between a single hearing officer and a three-member Adjustment Board, and thus in choosing the latter the prisoner has a right to count on the participation of every member. In this particular case, however, I believe that the reason the Board proffered to the court concerning the missing signature was enough to preclude the need for a second remand.

There is no dispute about why there were two, not three, signatures: one of the Board members no longer was employed by the prison system and thus, presumably, could not participate in the remand proceeding. Walton has never argued that the statement did not reflect the findings and conclusions of a majority of the Board or that there is any reason to believe the absent member would

have objected to the statement and persuaded the others to change it in some respect. The written statement, therefore, does not appear to be tainted by the lack of a third signature. In other words, there is no basis for arguing that omission of the third signature reflected some kind of protest against the substance of the written statement that the trial court was required to take into account.

All this is to say that I believe this court correctly reaches the merits of Walton's two technical arguments applying §§ 512.9 and 512.10, to the second written statement. There was no failure to exhaust administrative remedies because, as elaborated above, no administrative remedy was available. But because the regulations, §§ 512.9 and 512.10, did not afford Walton any basis for relief on the facts of this case, I agree with affirming the trial court's decision.

SCHWELB, Associate Judge, concurring in the result:

I join my colleagues in voting to affirm the Department's decision, and I agree with much of what Judge Reid has written. I write separately, however, because my assessment of several of the issues differs, in substance or in emphasis, from the treatment of those issues in the majority opinion.

## I.

### JURISDICTION

My colleagues' jurisdictional analysis appears to be predicated on the assumption that Walton's action against the District and its officials is really a habeas corpus proceeding, in effect though not in name. They conclude, relying upon our recent decision in *Abdullah v. Roach*, 668 A.2d 801 (D.C.1995), that the case was properly before the Superior Court pursuant to D.C.Code § 11-921(a)(3)(A)(iii) (1995), which expressly confers jurisdiction on that court over habeas corpus proceedings against persons other than federal officers or employees.

In my opinion, however, this case is significantly different from *Abdullah*. Unlike the petitioner in that case, Walton did not file a

petition for a writ of habeas corpus. He did not directly challenge the legality of his detention, nor did he seek relief from confinement or from adjustment segregation. Rather, he prayed for declaratory and injunctive relief, and he asked the court to vacate the finding that he violated two prison regulations and to expunge or remove from his file the documents relating to the challenged proceeding. As the majority expressly recognizes, we held in *Vaughn v. United States*, 598 A.2d 425, 431 (D.C.1991), that habeas corpus is not the exclusive means by which a prisoner may challenge the legality of disciplinary proceedings instituted against him. Under these circumstances, I am reluctant to recast Walton's suit for him. Rather, I would treat the case as being exactly what it appears to be—an action for relief from adverse and allegedly unlawful agency action.

We have held that the Superior Court may entertain claims for such relief pursuant to D.C.Code § 11–921(a)(6) (1995), which vests that court with jurisdiction over "any civil action or other matter, at law or in equity, brought in the District of Columbia." *See, e.g., District of Columbia v. Sierra Club*, 670 A.2d 354, 358–360 (D.C. Jan. [ ], 1996); *Speyer v. Barry*, 588 A.2d 1147, 1159–60 (D.C.1991) (citations omitted). In *Abdullah*, we recognized that Section 11–921(a)(6) served as an alternative jurisdictional basis for a suit by a prisoner who had alleged that his legal rights were violated in disciplinary proceedings instituted against him by correctional authorities.[1] That analysis applies with full force to Walton's case.

Contrary to the District's position, there is nothing novel in our recognition of the Superior Court's jurisdiction to consider the legality of agency action alleged to be unlawful. Even where the liberty of the citizen is not at issue, "the actions of government agencies are normally presumed to be subject to judicial review unless [the legislature] has precluded review or a court would have no law to apply to test the legality of the agency's actions." *Simpson v. District of Columbia Office of Human Rights*, 597 A.2d 392, 398

(D.C.1991) (quoting *Carlin v. McKean*, 262 U.S.App.D.C. 212, 214, 823 F.2d 620, 622 (1987)), *cert. denied*, 484 U.S. 1046, 108 S.Ct. 784, 98 L.Ed.2d 870 (1988). "[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review," *Abbott Labs. v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967) (citations omitted), and as we held in *Abdullah*, no such evidence exists with respect to the LRAA.

The authority of courts to grant relief from unlawful agency action existed at common law, and it was merely reinforced (and not created) by the federal Administrative Procedure Act and similar local enactments. *See Abbott Labs., supra*, 387 U.S. at 140, 87 S.Ct. at 1511; *Sierra Club, supra*, 670 A.2d at 358–359. "The presumption of reviewability is not the product of enacted law; it is common law." 5 KENNETH C. DAVIS, ADMINISTRATIVE LAW TREATISE § 28:1, at 254 (1984). The Superior Court thus had "civil action" jurisdiction over Walton's complaint, and there is no need to treat that complaint as a petition for habeas corpus when such a characterization is contrary to the pleader's intent.

## II.

### THE EVIDENCE OF GUILT

I agree with the majority that there was "some evidence" of Walton's guilt of the two disciplinary charges, *see Superintendent v. Hill*, 472 U.S. 445, 454–55, 105 S.Ct. 2768, 2773, 86 L.Ed.2d 356 (1985), but I find the case closer and perhaps more troubling than my colleagues do.

The essence of the charges against Walton is an alleged attempt on his part to be a small-scale prison bootlegger. In his brief, Walton argues in pertinent part as follows:

> With respect to Section 502.11(b) there are two requisite showings: that appellant was (1) in "possession of, making or attempting to make" (2) an "intoxicating beverage." With regard to the "making, or attempting to make" phrases, there is [no]

---

1. *Abdullah* does not suggest, and neither do I, that a prisoner asserting jurisdiction pursuant to Section 11–921(a)(6), rather than under the ha- beas corpus statute, is thereby excused from exhausting his administrative remedies.

evidence in the disciplinary report, or any other document introduced at the hearing, or in Sgt. Bonaparte's own testimony that showed there was any evidence of this type of activity on Walton's part. Thus, there is no indication in the disciplinary report [1] that any winemaking "paraphernalia" [were] found in the course of the shakedown: there were no funnels or filtering devices, or fruit and sugar to further fermentation, or evidence that the grapefruit juice had been altered or enhanced in any way.

Further, the standard for a guilty finding of possession of contraband under Section 502.11(b) is that the substance constitute an "intoxicating beverage." Here, too, the Department introduced *no evidence* at the Adjustment Board hearing that the grapefruit juice in Walton's possession was capable of "intoxicating." In fact, the only evidence at the hearing on this issue was Dr. Seipel's testimony that a solution of "less than 1%" alcohol could *not* intoxicate a normal adult. (Emphasis in original.)

The District's response to this contention is brief and to the point:

The bottom line in this case, when it is stripped of the complex constitutional issues, is that it is undisputed that Walton had gallons of fruit juice in a bag wrapped in a blanket and mattress cover, and that the prison officials made the logical and permissible inference that Walton was attempting to make "shoots," or homemade wine, and used the juice in a manner contrary to the intent of its issuance. This evidence amply supported the finding that he was guilty of the class I and II contraband offenses.

To me, the decisive question which emerges from these contentions is whether Walton's possession and apparent concealment of a large amount of improperly acquired grapefruit juice is "some evidence" that he attempted to make homemade wine. My colleagues emphasize that Walton did not deny that there was a smell in his cell. I should think, however, that such a large amount of non-alcoholic grapefruit juice might also be discernable to the educated

nostril. If I were the trier of fact, and if I were not provided with further enlightenment on the subject, I might have considerable difficulty concluding that this evidence proved that Walton was trying to become an amateur manufacturer of wine.

The reality is, though, that I am *not* the trier of fact. Presumably, the Lorton officials who heard the evidence know a great deal more about running a prison than judges do. A part of that superior knowledge doubtless extends, or at least should extend, to the manner in which prisoners try to make "shoots" or other intoxicants from the limited (one hopes) raw materials available to them. Our review of such proceedings, although apparently authorized by the LRAA, should therefore be very deferential indeed. Under that standard, I agree that we must reject Walton's position on this issue.

### III.

### THE REMEDY

The trial judge concluded that the Adjustment Board's initial written decision in Walton's case was legally insufficient. He remanded the case to the Department of Corrections for more comprehensive written findings. Walton contends that this remedy was inadequate, and that he is entitled to expungement of the adverse findings and of related documentation. My colleagues disagree and, emphatically, so do I.

The requirement in the LRAA that correctional officials must provide adequate written findings in prison disciplinary proceedings is grounded in the Supreme Court's due process analysis. *See Wolff v. McDonnell*, 418 U.S. 539, 565, 94 S.Ct. 2963, 2979, 41 L.Ed.2d 935 (1974). The trial judge recognized this, and ordered the Department of Corrections to make more appropriate findings. The defect in the initial findings thus could be, and indeed has been, corrected. In a case such as this one, in which the substantive determination of guilt has been sustained, it would be altogether incongruous to treat Walton as if he had been exonerated and, in effect, to expunge the result of the proceedings from the face of the earth, simply because the

correctional authorities did not write the case up in sufficient detail the first time around.

Where an agency has failed to make sufficient findings, the appropriate remedy is to remand with directions that the omission be corrected and that adequate findings be made. *See, e.g., Mack v. District of Columbia Dep't of Employment Servs.*, 651 A.2d 804, 806 (D.C.1994). In my opinion, that was the proper remedy here, and the trial judge acted reasonably in adopting it. To award Walton more than that would constitute a windfall, rather than a correction of any violation of his rights. *Cf. Carey v. Piphus*, 435 U.S. 247, 260, 98 S.Ct. 1042, 1050, 55 L.Ed.2d 252 (1978).

Walton points out that the LRAA requires a written statement of the Board's decision within three days of the hearing. 28 DCMR § 512.10. Obviously, the revised findings which followed the trial court's remand were not issued within that time period. So far as I can discern, however, there is no claim that Walton was prejudiced by this delay, which was inevitable once judicial review was sought.[2] We are nevertheless asked to hold, in the absence of any prejudice, that an inmate who has violated prison regulations must be relieved of the consequences of his transgression because errors in the findings were not corrected within three days. But correctional officers are not trained opinion-writers, *cf. Ponte v. Real*, 471 U.S. 491, 497–98, 105 S.Ct. 2192, 2196, 85 L.Ed.2d 553 (1985), and the rule for which Walton contends would, in my opinion, provide a "remedy" out of all proportion to the violation. It would also cause serious and wholly unnecessary difficulties for conscientious prison administrators, who would be compelled to allow violations by inmates to go unpunished for reasons unrelated to guilt or innocence.

To the extent, if any, that the draconian remedy demanded by Walton may be viewed as supportable under certain federal appellate and other precedents,[3] I do not believe that those precedents can be reconciled with the Supreme Court's approach to such issues in *Ponte v. Real, supra,* and *Sandin v. Conner,* ——— U.S. ———, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Accordingly, I cast my vote for proportionality and against importing into our correctional facilities the law's continuing but dubious preoccupation with scrivening imperfections that cause no prejudice and do not affect the merits.

---

2. I recognize that the Adjustment Board's decision can have unfavorable collateral consequences for an inmate, *e.g.,* in relation to his prospects for parole. *Wolff, supra,* 418 U.S. at 565, 94 S.Ct. at 2979. Where inadequate findings have affected the result of subsequent proceedings, those proceedings *should* be revisited. I am not aware, however, of any such claim on Walton's behalf.

3. *See, e.g., Redding v. Fairman,* 717 F.2d 1105 (7th Cir.1983), *cert. denied,* 465 U.S. 1025, 104

S.Ct. 1282, 79 L.Ed.2d 685 (1984). I note that in *Redding* the court held that it was the function of the trial judge to balance the interests of the parties and to exercise discretion in determining whether "expunction" is appropriate. 717 F.2d at 1118–19. Assuming, *arguendo,* that it would have been within the discretion of the trial judge in this case to grant expunction and the other relief sought by Walton, his refusal to do so was not an abuse of that discretion.